## Woods Schools Tax Exemption Case.

580

Argued January 8, 1962.  Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Walter J. Collins, Jr.,* with him *David F. Maxwell,* and *Obermayer, Rebmann, Maxwell and Hippel,* for appellant.

*Louis J. Goffman,* with him *Seymour Kurland, Morris Wolf,* and *Wolf, Block, Schorr and Solis-Cohen,* for all appellees.

*Sidney T. Yates* and *John W. Dean, 3rd,* for Middletown Township School District and Middletown Township, appellees.

*Donald W. Vanartsdalen* and *Frederick T. Bebbington,* for Langhorne Borough School District and Langhorne Borough, appellees.

*Samuel S. Gray, Jr.,* for Bucks County, appellee.

OPINION BY MR. JUSTICE EAGEN, March 13, 1962:

This is a real estate tax assessment case. Total exemption from all real estate taxation is sought by the appellant, the Woods Schools, on the ground that it is a "purely public charity."

Woods Schools is a nonprofit corporation which maintains and operates a private institution in Bucks County, Pennsylvania, for the education, treatment and care of children and adults, who are physically, mentally, socially or emotionally handicapped. Its real estate holdings presently include over 326 acres of land improved with approximately 80 buildings.

The institution seeks the fullest development and rehabilitation of its pupil-patients by maintaining a campus which is self-sufficient, and a group of separate, self-contained schools and treatment units. A large

staff of professional specialists, physicians, physical therapists and the like are continuously retained.

The school was originally founded in 1915, by Miss Mollie Woods (later Mrs. Hare), and conducted as a private business. In 1942, it was incorporated as a private business corporation. Mrs. Hare was its sole shareholder and president. In 1949, the school was incorporated as a nonprofit corporation. Mrs. Hare then transferred the assets of the business corporation to the nonprofit corporation in consideration for the promise that she would be paid the sum of $15,000 annually for life (she died in 1956), and also provided with a house fully furnished and maintained, plus food, and all conveniences necessary for a reasonably good standard of existence. The new corporation also assumed the obligation of payment of current liabilities of the business in the amount of $64,401.77, and a debt due Mrs. Hare in the amount of $168,509.66.

In 1958, the corporation constructed and established a Child Study, Treatment and Research Center costing $655,789.15. The money necessary consisted of a construction grant from the federal government in the amount of $176,250, a gift from the school's accumulated surplus fund in the sum of $185,000 and gifts from interested individuals and organizations in the amount of $294,539.15.

Real estate taxation was paid without protest until 1959, at which time the corporation applied to the proper municipal authorities for total real estate tax exemption on all lands and buildings occupied and utilized by the school and the research center. The request was denied. On appeal to the common pleas court, a decree was entered which ruled the land (176 acres) and the building used in connection with the research center, plus 20 acres of adjoining land as a reasonable curtilage, to be exempt. The tax assessment levied against the land and buildings of the school itself was upheld.

An appeal to the Superior Court resulted in an affirmance of the lower court's decree, 195 Pa. Superior Ct. 531 (1961). We granted allocatur.

The legal question presented is, whether the Woods Schools, that is both the school and the research center, is a "purely public charity" and founded and maintained to a sufficient degree by public or private charity to entitle it to tax exemption under Art. 9, §1, of the Pennsylvania Constitution and Art. II, §202 of the Act of May 21, 1943, P. L. 571, 72 PS §5453.202. It is a mixed question of law and fact.

The pertinent section of the Act of 1943, supra, provides as follows: "The following property shall be exempt from all county, borough, town, township, road, poor . . . and school tax, to wit: . . . (3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence or charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose."

Constitutional authority for the enactment of such legislation exempting from taxation "institutions of purely public charity" is given by Article 9, §1, of the Constitution of Pennsylvania, which reads as follows: ". . . the General Assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, institutions of purely public charity and real and personal property owned, occupied, and used by any branch, post, or camp of honorably discharged soldiers, sailors, and marines; . . . ."

For the appellant to obtain the claimed exemption from taxation, it must affirmatively show that the entire institution, (1) is one of "purely public charity"; (2). was founded by public or private charity; (3) is maintained by public or private charity.

The record clearly sustains the finding of the lower court that the school was founded in charity and made possible in great part by the charitable beneficence of Mrs. Hare. In fact, the net effect of the transaction, involving the transfer of the assets of the business corporation owned by Mrs. Hare to the new nonprofit corporation, was an outright gift in the sum of approximately $500,000. As of that time, the corporation had a net worth of $458,396.45 and its accumulated surplus amounted to $358,396.45.[1]

We agree with the conclusion of both lower courts that the school section which concerns itself with the education, care and treatment of its pupil-patients is, in fact, a separate and distinct entity from the research center.

While the research center, undoubtedly, benefits from the proximity of the school and the living cases it affords for study, the record fully justifies the conclusion that the work and basic purposes of each are not so closely related or interdependent, as to have a tax exemption given to one carry-over to the other.

We further agree that the appellant has not met its burden of establishing that the school and treatment unit itself is one of "purely public charity" or is maintained by charity.

There are approximately 400 individuals enrolled in the school and treatment unit. Admission is not restricted on the basis of religion, color or creed. However, it is restricted in almost total part to those who

---

[1] It is interesting to note that Miss Woods original investment was $175.

are able to pay for the services rendered. The average tuition presently charged is $4,581.87 per individual. It is charged to all, regardless of the ability to pay. It is fixed to carry the operating costs for the entire institution, both school and center. Additional charges are made for psychological and physical therapy, special medicines, music lessons, etc. No student attends free of all charges. Partial scholarships in the form of deductions from the gross tuition are given. In the usual year, such scholarship deductions allowed by the school itself amount to 1.0% of the total tuition received and are distributed among 2% of those enrolled. Donations in relatively small amounts are allocated for scholarship purposes, but with these added to the allowances given by the school, the total amount given in partial scholarships is less than 2% of the total tuition income.

In 1958, the total operating revenues of the institution amounted to $1,575,785. For the five-year period of 1954-1958 (it was stipulated that this period provides a good example of operation), the total operating revenues[2] exceeded the total operating costs (including payment of annual real estate taxes of approximately $13,500) of the entire institution in the amount of $468,478. If total depreciation, as claimed in an amount averaging $60,000 annually, is allowed and added to operating costs, the income still exceeded this combined total in the amount of $163,283.

In 1959, the institution's net worth had increased to $1,438,193.99. The indebtedness assumed by the corporation as of the date of the transfer of assets by Mrs. Hare, had been completely paid off and the indebtedness due Mrs. Hare personally had been liquidated to the extent of $118,470.

---

[2] The record seems clear that virtually all of appellant's non-charitable income is derived from its pupils and the school operation. No significant part is earned from the operation of the center.

All of the excess revenue together with substantial private donations and public grants[3] are used in the improvement and expansion of the institution's facilities.[4] No one has derived pecuniary benefit therefrom. The institutions's operations are governed by a board of trustees who serve without remuneration. The 400 or more employees, professional and nonprofessional, are paid salaries or wages comparable with other institutions. During the four-year period of 1955-1958, inclusive, a total contribution of $100,000 at the rate of $25,000 yearly was made to the employes' pension plan and charged to operating expenses.

Under the facts, we conclude that the *Ogontz School Tax Exemption Case,* 361 Pa. 284, 65 A. 2d 150 (1949), is controlling. While it is true that this Court properly found therein that the institution concerned was not founded in charity and in reference to these facts, the case is distinguishable, it also clearly enunciated the principle that even an institution of learning must possess an eleemosynary characteristic if it is to be deemed benevolent and charitable for tax exemption purposes. As stated at page 292, "An institution whose free patrons number only about 10% of all its patrons cannot be classed as an institution of purely public charity." Again, at page 295, the Court said, "With exceptions so negligible as not to be a controlling factor in our decision, what this School does for its students is not done free of charge or so nearly free of charge as to make those charges merely nominal. Certainly the students who pay $1,900 a year for the education and board and lodging they receive at this School cannot (and assuredly do not) regard themselves as objects of charity."

---

[3] The latter two combined during the period of 1954-1958 totaled $626,000.

[4] The lower court properly concluded that the use made of these items was for the benefit of the center only.

In short, *Ogontz* emphasized that a school to qualify as a "purely public charity" must donate or render gratuitously a substantial portion of its educational services. This same thinking was re-emphasized later in *Hill School Tax Exemption Case*, 370 Pa. 21, 87 A. 2d 259 (1952).

It is quite evident that the school and treatment unit of the appellant's institution does not meet this test. In fact, a portion of the charges exacted from the enrollees of the school are used for the operation and improvement of the center which is separate and apart. The fact that the school was chartered as a nonprofit corporation and no one receives profit from its operation does not in itself clothe the school with exemption from taxation, *Ogontz*, supra.

We further agree with the learned courts below that the *Hill* case does not overrule or modify *Ogontz*. In *Hill*, the school operated at a loss for 26 out of the 29 years of its existence. Forty-nine per cent of its students received tuition aid. The total operating revenues covered only 82% of the cost of operation.

Nor is *Episcopal Academy v. Philadelphia*, 150 Pa. 565, 25 Atl. 55 (1892), to be equated with the facts herein. The tuition charged in that academy was much less than the tuition charged by comparable institutions. Eight per cent of the students paid one-half of the regular tuition and 9% paid no tuition at all. In other words, the institution utilized the excess income realized over operating costs in making its services available to as great a number of students as possible and particularly to a large number unable to pay their own way.

It is true that a "purely public charity does not cease to be such where it receives some payment for its services." *Hill*, supra, at page 27. It is also true that this is so even though the revenue received is sufficient to meet the cost of operation, *Episcopal Academy v.*

*Philadelphia,* supra. However, as stated in *Ogontz,* supra, the institution to retain this characteristic must be managed as a charity in the sense that all benefits within reasonable limits are afforded to others who gain advantage of the service rendered by that institution through the wise application of the profits realized from tuition charges. Certainly, the profits may not be used to enhance another institution which is separate and apart.

The contention that in evaluating the institution's yearly budget the fair rental value of the buildings as donated properties should be included, in addition to total depreciation of the same buildings, is without merit.

The order of the Superior Court is affirmed.

Mr. Chief Justice BELL and Mr. Justice MUSMANNO dissent.