557 A.2d 828

In Re: Appeal of The Bethlen Home of The Hungarian Reformed Federation of America From The Westmoreland County Board of Assessment and Revision of Taxes: 1986 Assessment of Tax Map Parcel Numbers 51-16-07-0-005-60-001, etc. The Westmoreland County Board of Assessment Appeals, Appellant.

Submitted on briefs October 6, 1988, to Judges BARRY and SMITH, and Senior Judge BARBIERI, sitting as a panel of three.

*Debra M. Nicholson*, with her, *Aaron M. Kress*, for appellant.

*Richmond H. Ferguson*, with him, *Pamela H. Ferguson*, for appellee.

OPINION BY JUDGE BARRY, April 21, 1989:
The Westmoreland County Board of Assessment (Board) appeals from an order of the Court of Common

Pleas of Westmoreland County which sustained the tax exemption claim of Bethlen Home of the Hungarian Reformed Federation of America (Bethlen).

Bethlen is a Pennsylvania non-profit corporation that owns approximately 160 acres of land in Ligonier Township, Westmoreland County, on which is a nursing home which provides intermediate and advanced nursing care,[1] and a number of retirement cottages, each containing two separate living units. In 1986, the County assessed the seven retirement cottages and the land on which they were erected for real estate taxes.[2] Bethlen appealed this assessment to the Board which denied the appeal. It then appealed to the Court of Common Pleas of Westmoreland County which sustained the appeal and held that the retirement cottages were tax exempt. This appeal by the Board followed.

Bethlen claimed exemption pursuant to Article VIII, Section 2(a)(v) of the Constitution of the Commonwealth of Pennsylvania[3] and Section 204(a)(3) of The General County Assessment Law (Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. §5020-204(a)(3), which provides:

> (a) The following property shall be exempt from all county, borough, town, township, poor, and school tax, to-wit:

> (3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence or charity, including fire

---

[1] The tax exempt status of the nursing home is not at issue.

[2] Three more cottages had been constructed after the 1986 assessment. Notes of Testimony (N.T.) p. 8, (December 15, 1987).

[3] That provision of the state constitution states that "[t]he General Assembly may by law exempt from taxation: Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purpose of the institution."

and rescue stations, with the grounds annexed thereto and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity ...

The question of whether an institution is one of "purely public charity" is a mixed question of law and fact on which the trial court's decision is binding absent abuse of discretion or lack of supporting evidence. *G.D.L. Plaza Corporation v. Council Rock School District,* 515 Pa. 54, 526 A.2d 1173 (1987). The same is true for the questions of whether an institution is founded, endowed and maintained by public or private charity. *Id.*

To obtain the claimed exemption from taxation, Bethlen must have affirmatively shown that its cottage operation "(1) is one of 'purely public charity'; (2) was founded by public or private charity; and (3) is maintained by public or private charity." *Woods School Tax Exemption Case,* 406 Pa. 579, 584, 178 A.2d 600, 602 (1962). An institution qualifies as a purely public charity if it possesses the following characteristics:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate objects of charity;

(d) Relieves the government of its burden; and

(e) Operates entirely free from private profit motive.

*Hospitalization Utilization Project v. Commonwealth,* 507 Pa. 1, 21-22, 487 A.2d 1306, 1317 (1985).

To reside in one of the twenty living units that are available, occupants must be 65 years of age or older. They must, according to the agreement which all must sign (agreement), submit a current physician's report on a form prepared by Bethlen, which includes an evalua-

tion of their fitness for independent cottage living, as well as evidence of their financial ability to "sustain independent cottage living".[4] It is stated in the agreement that Bethlen does not discriminate against anyone on the basis of race, creed, color, sex or ethnic origin.

Cottage occupants pay an entrance fee for the right to occupy a living unit for the rest of their lives or until their health necessitates transfer to the nursing home. The amount that has been collected for that fee is that portion of the construction costs of the unit which Bethlen determines the occupant is financially able to pay. It has ranged from $25,000 to $44,500.[5] No person has taken occupancy of a unit without paying an entrance fee. Person(s) currently occupying ten of the twenty units were admitted upon paying an entrance fee which was less than their unit's construction cost; that being the

---

[4] Bethlen's witness testified that, despite this latter requirement, persons were not denied admission because of their financial situation, N.T. 33-4, and that persons who had a monthly income of only $300 in social security benefits had been admitted, N.T. 40. In addition, he testified that occupants were never asked to provide such evidence, N.T. 40. The trial court states in its opinion: "In the present case, the agreement requires only evidence of financial ability to 'sustain independent cottage living', such as paying utilities and food. In practice, no person was ever refused admission because of financial ability [sic], and, in fact, ten paid less than the fees contemplated by the Appellant." *Bethlen Home of the Hungarian Reformed Federation of America Appeal,* (No. 4143 of 1987, filed March, 1988), slip op. at 8-9. It is unclear whether the trial court, in making this statement, is indicating that it found that persons who were financially unable to "sustain independent cottage living" were admitted, or only that persons who were financially unable to pay the entrance fee Bethlen sought to collect were admitted. The trial court does not indicate in its opinion that it found that Bethlen, in spite of language in the agreement indicating otherwise, did not request that occupants submit evidence of financial ability to "sustain independent cottage living."

[5] N.T. 50-52.

amount which Bethlen seeks to collect.[6] In the event that a cottage occupant dies or moves away within ten years after having taken occupancy of the unit, a portion of the entrance fee collected is refunded to him or his estate except when he is transferred into the nursing home or is survived by a co-occupant.[7] The amount of the refund depends upon how long he has occupied the unit. After a unit is vacated, new persons take occupancy of it upon payment of an entrance fee.

Cottage occupants also pay a monthly service fee, currently $25.00, and utilities, including sewage, telephone, heat and lights. In the event that the cottages are subjected to real estate taxes, they are also required to pay their share of those taxes. The monies collected for the monthly service fee are, according to the agreement, for lawn mowing, snow removal and the cost of insuring the cottages.[8] They are, however, insufficient to cover the costs of lawn mowing and snow removal. Cottage occupants are also responsible for living expenses including food, insurance on personal possessions and any expenses where physicians, hospital confinement, specialists, nurses, special equipment, drugs, etc., are required. According to the agreement, any nursing visits, physical therapy, reality orientation, blood specimens, or, in extreme emergencies, visiting nurses, etc., will be billed to the occupant at the prevailing rate then in force at the

---

[6] The construction costs of a living unit started out at $35,000 and eventually increased to $45,000. N.T. 50-51.

[7] In the former case, the costs of the occupant's care in the home are deducted from the amount that would be refunded. In the latter case, the amount that would be refunded is transferred to, and becomes property of, the co-occupant.

[8] According to the terms of the agreement, Bethlen is also generally responsible for both repairs to the cottages and repairs to, and replacements of, items of personal property it has placed in the cottages. The monthly service fee is not, however, designated to cover the costs incurred in making such repairs and replacements.

nursing home. However, cottage occupants have had their blood pressure tested by nurses employed at the nursing home and those nurses, on occasion, have gone to the cottages to provide care to the occupants without charge.

Cottage occupants are able to utilize certain of the nursing home's facilities and have access to certain services provided to the nursing home residents. They are able to make use of the nursing home's solarium and recreation areas. Although, according to the terms of the agreement, they must pay for meals served in the nursing home's dining room, those who come there to eat are permitted to do so free of charge. Most, however, eat meals in their apartments.[9] Cottage occupants have access, without charge, to religious and counselling services provided at the nursing home and are also provided without charge with assistance in managing their financial affairs by the staff of both the nursing home and cottages. Under the terms of the agreement, they may attend programs and activities if transportation and space are available and may be involved in arts and crafts, if there is no conflict with the already scheduled programs for the nursing home residents. They have been able to participate in special activities and festivities that are conducted at the nursing home on holidays.[10]

In the event a cottage occupant becomes financially unable to pay the "maintenance cost of his cottage",[11] he

[9] Bethlen's witness, in fact, indicated that only one occupant had continuously eaten two meals a day in the nursing home dining room. N.T. 45.

[10] Bethlen's witness also testified that, where cottage occupants had needed transportation to get to a doctor's appointment or to go shopping, they were provided with such service. N.T. 23, 27. This would appear contrary to language in the agreement indicating that cottage occupants are to be responsible for their own transportation. We note that the trial court made no finding of fact to this effect.

[11] The trial court construed the term "maintenance cost of the cottage" to mean the monthly service fee. *Bethlen Home,* slip op. at

can, under the terms of the agreement, continue to reside in it as long as he is physically able to "maintain the cottage." As of yet, however, none of the occupants had become unable to pay the monthly service fee. Furthermore, a cottage occupant who becomes financially unable to maintain himself in his or her cottage and physically disabled is, according to the agreement, eligible for transfer to the nursing home and to reside there free of charge. However, in the event that he would be entitled to a refund of the portion of the entrance fee, this refund would be applied toward payment for his care in the nursing home. Up to the present time, two persons who were admitted for cottage occupancy have been transferred to the nursing home. The amounts that they were entitled to have refunded have been totally expended and they are now receiving free care and will continue to do so for the rest of their lives.

Bethlen had the burden of showing that its cottage operation satisfies all of the five criteria for a "purely public charity" set forth in *Hospital Utilization Project*. We do not believe that the second criterion—that of donating or rendering gratuitously a substantial portion of its services—is satisfied.

In both *Passavant Health Center v. Board of Assessment and Revision of Taxes of Butler County,* 93 Pa. Commonwealth Ct. 575, 502 A.2d 753 (1985) and *Lutheran Social Services Appeal,* 114 Pa. Commonwealth Ct. 628, 539 A.2d 895 (1988), this Court held that when retirement cottage occupants were determined to be in need of nursing care and were automatically entitled to admission to a nursing home regardless of their ability to

---

3. The trial court did not, however, indicate what it found the agreement to mean when it requires those occupants who are unable to pay the maintenance cost of the cottage to be physically able to "maintain the cottage" in order to continue to live therein.

pay for such care, this evidenced a charitable purpose on the part of *the nursing home,* and not the cottages themselves. Thus, the fact that Bethlen's cottage occupants may be able to receive free nursing care in its nursing home at some time in the future is irrelevant to the determination of whether the cottage operation is of "purely public charity." It also follows from the aforementioned cases that the fact that cottage occupants have access without charge to services provided by Bethlen's nursing home staff to its nursing home residents, and are able to make use of certain facilities of the nursing home, also does not establish a charitable purpose on the part of the cottages themselves.

Thus, it appears that the only relevant services that Bethlen provides to its cottage occupants are repair of its cottages, repair and/or replacement of items of personalty, (both of which can be interpreted as Bethlen's protection of its investment), lawn mowing and snow removal. Even though the first two of these services are provided free and the latter two provided for a nominal fee of $25.00 per month, it is the opinion of this court that the furnishing of these services is insufficient to satisfy the second criterion of *Hospitalization Utilization Project*.

Accordingly, the order of the trial court is reversed.[12]

## ORDER

NOW, April 21, 1989, the order of the Court of Common Pleas of Westmoreland County entered March 21, 1988, at Docket No. 4143 of 1987 is hereby reversed.

---

[12] Because we find that one of the five criteria set forth in *Hospital Utilization Project* is not satisfied, we do not address the question of whether the other criteria are satisfied.