**ALLIANCE HOME OF CARLISLE,**
Pa. t/a Chapel Pointe,
Appellant

v.

**BOARD OF ASSESSMENT APPEALS,**
Carlisle Area School District, Borough
of Carlisle, and Cumberland County.

Commonwealth Court of Pennsylvania.

Argued March 31, 2004.
Decided June 15, 2004.

Steven T. Hanford, Harrisburg, for appellant.

Thomas E. Flower, Carlisle, for appellees.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, COHN, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Alliance Home of Carlisle, Pennsylvania, t/a Chapel Pointe (Chapel Pointe) appeals from an order of the Court of Common Pleas of Cumberland County (trial court) denying its request to extend its charitable real estate tax exemption to the parcel of property on which its independent living section is located.

Chapel Pointe is a non-profit corporation that was formed in 1944 to provide a home and sustenance for aged and infirm people in Carlisle, Pennsylvania. It currently operates as a licensed continuing care retirement community. Located on its property is a 59–bed skilled nursing home, which has been exempted from real estate taxation as a hospital and a 53–bed assisted living compound, which has been exempted as well. Also located on the property and

at issue in this case are 93 apartments that function as the independent living component of the Chapel Pointe retirement community. In 1997, the trial court affirmed a decision by the Cumberland County Board of Assessment (Board) denying an extension of the tax exemptions for the skilled nursing home and assisted living areas to the contiguous parcel on which the independent living units are located, finding that Chapel Pointe was not a purely public charity and was not entitled to an exemption from real estate taxes on the apartment units. Chapel Pointe did not appeal this decision.

In 2001, after the enactment of the Institutions of Purely Public Charity Act[1] (more commonly referred to as "Act 55"), Chapel Pointe again petitioned the Board requesting a determination that it was entitled to a presumption under Act 55 that it was an institution of purely public charity, and the parcel consisting of the independent living apartments be exempt from real estate taxes as a purely public charity. It argued that it met both the constitutional and statutory tests for exemption by providing, among other things, uncompensated goods and services to the residents which were in excess of five percent of the cost of providing such goods and services as required. The Board denied the request after concluding that it was *res judicata* based on the 1997 decision and precluded re-litigation. Chapel Pointe then appealed to the trial court which permitted a hearing on the matter.

At the hearing, Chapel Pointe presented the testimony of H. David Padden (Padden), a certified public accountant, who provided the following information regard-

ing Chapel Pointe's 93 [2] independent living apartments: he stated that the minimum age requirement for a resident in an apartment was 62, and that all the apartments were privately paid for by the residents without any government subsidies. He explained that a perspective resident had to provide Chapel Pointe with a detailed financial statement, and Chapel Pointe did not admit any resident who could not pay the entrance fee up front and whose financial information did not reflect that they could pay the monthly rental fees. One apartment unit was used as a model. The total amount for the entrance fees for the 92 apartments for residents was $5,721,000. As of the date of the hearing, four apartments were vacant. The entrance fee was amortized to income over a period of time.

Padden continued to state that Chapel Pointe placed each apartment on a 40–year depreciation schedule, and the average stay for a resident was three to four years. However, residents could stay in their apartments as long as they were safe and then they could be moved to either the assisted living compound or to the nursing home within Chapel Pointe. He stated that the average stay of a resident was four to five years. He further stated that Chapel Pointe amortized all entrance fees over the life expectancy of the resident. He explained that Chapel Pointe amortized the entrance fee at 20% each year prorated monthly for five years; therefore, if a resident left the apartment within five years, a prorated amount of the entrance fee would be refunded. Nonetheless, all income earned on an entrance fee was retained by Chapel Pointe, and after five years, no portion of the entrance fee was

---

1. Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–385.

2. The 93 apartment units consist of the Colonial Apartments (11 units); Jarrett Apart-

ments (three, 4–unit townhouses); Heritage & Harmony Suites (two, 12–unit apartment buildings); Cornerstone Manor (23 units); and Bedford Terrace (23 units).

refundable. Padden also stated that a uniform monthly rental fee was charged for each apartment. Regarding uncompensated services, Padden stated that 55% of the apartment residents received some type of uncompensated services such as assistance with the timely taking of medications, participation in some social activities, and advice regarding family or financial problems which amounted to them receiving uncompensated services greater than 10% of the cost of care.

Regarding Chapel Pointe's financial statement, Padden stated that Chapel Pointe allocated its administrative costs on the basis of total operating costs, with 68% of administrative costs allocated to the nursing home, 22% to the assisted living compound, and 9% for the independent living apartments. Although Padden testified that for years 1998, 1999 and 2000, Chapel Pointe realized an operating loss and had relied upon contributions and bequests to make up for that loss, on cross-examination, he admitted that in arriving at the figures that determined the losses, he included depreciation for each year and did not include other contributions and non-operating revenues and gains.

John Hendrickson (Hendrickson), the Executive Director of Chapel Pointe, testified that entrance fees ranged from $37,000 for an efficiency apartment to $73,000 for a two-bedroom apartment, and that Chapel Pointe earned 20% from each entrance fee that was charged. He could not recall ever waiving the entrance fee. Currently, the rent was $599 for one resident and an additional $130 for an additional occupant. Hendrickson indicated that there were a few residents who had trouble meeting their monthly payment and were receiving some financial assistance from Chapel Pointe. Residents whose income had become insufficient to pay the rent were required to immediately apply for financial assistance from their family, church or public welfare agencies. He noted that if the monthly rental fee was not timely paid, Chapel Pointe could terminate the residency, although it had never done so. Residents were required to annually prepare and submit a current financial statement to Chapel Pointe and the failure to do so constitutes grounds for termination/eviction. Hendrickson stated that it was Chapel Pointe's policy for any surplus in revenues that were generated from fees charged or from charitable donations given to remain with Chapel Pointe. To defend the requirement of the entrance fee and a resident's disclosure of his or her assets, Hendrickson explained their importance:

There is a limit to the amount of benevolent care that we can provide. We're not a large facility with a huge endowment that can provide benevolent care without using monies coming in from operations. So we want to look at and be sure that we're going to be able to provide the benevolent care that we've already committed to, and so we have to be sure that there are people who are coming in are private pay. The other reason is that we want to be sure that we have something to compare a disclosure to now should they apply for a different level of living down the road and there is a significant difference in the amount of assets that are there. **Again, we do not want to give charity to just anyone. We want to give charity to or financial assistance to people that truly qualify for financial assistance.** (Emphasis added.)

(Reproduced Record at 157–158.) Richard Lehmann, Chapel Pointe's director of Financial Services, testified that there were only three residents that were currently receiving direct financial assistance from Chapel Pointe. He explained that that meant that those residents could not cover

the rental fee and, although they were billed the full amount, Chapel Pointe wrote off $100 or $150 a month as a benevolent allowance.

Testifying on behalf of the Board and Cumberland County (County) were William Reath (Reath), a real estate assessor with the County and Randy Waggoner (Waggoner), an assessment consultant for Wolfe and Shearer Realtors. Reath testified that the current assessed value of the 93 apartments was $2,593,350 for 100% of the market value in the year 2000. Waggoner testified that he previously worked for 18 years in the Cumberland County Assessment Office, 13 of those years as its Chief Assessor. He stated that he visited the independent living apartments and then conducted a rental survey of rental apartments in the area to compare rental prices. He found that the low-end of the scale for one-bedroom apartments was $325 per month and $425 per month for two-bedrooms while the average was $350 per month and $450 per month for one-bedroom and two-bedroom apartments, respectively.

The trial court initially denied Chapel Pointe's contention that it was entitled to a rebuttable presumption under Act 55 that it was a purely public charity because that was a preliminary question which first had to be answered within the meaning of Article 8, Section 2(a)(v) of the Pennsylvania Constitution. It then denied Chapel Pointe's petition for an exemption from the real estate tax as a purely public charity because it did not prove that it donated or rendered gratuitously a substantial portion

of its services to the residents of its apartments, noting that residents had to meet financial requirements before admission; Chapel Pointe received $5,721,000 for 92 units plus additional entrance fees for subsequent occupants; it retained the entire entrance fee after five years and prorated the fee if the resident died or left before that time; and it charged a monthly rental which was substantially higher than the norm for a rental in the Carlisle area. The trial court noted:

> This system gives older people, at a considerable cost, a safe comfortable place to live, it provides ancillary services for a charge, and residents get priority for transition into the assisted living compound and/or nursing home if the unfortunate need arises. The system provides a substantial amount of money for Chapel Pointe, and a steady source of future occupants of its assisted living compound and nursing home.

(Trial court's January 31, 2002 opinion at 17.) This appeal by Chapel Pointe followed.

Chapel Pointe contends that the trial court erred in refusing its request for a tax exemption because it looked at the parcel of land on which the independent living apartments are located separately from the other living facilities, i.e., the assisted living and skilled nursing facilities, when considering whether Chapel Pointe was a purely public charity under Article 8, Section 2 of the Pennsylvania Constitution and Act 55 instead of treating Chapel Pointe as one institution in making its evaluation.[3]

---

3. Chapel Pointe initially argues that the trial court erred in concluding that it was not entitled to the rebuttable presumption that it was an institution of purely public charity because it previously was found to be an institution of purely public charity regarding its other facilities. It directs our attention to Section 5(b) of Act 55 which provides:

**Burden of proof.** If an institution of purely public charity asserts a presumption under subsection (a), a political subdivision challenging that institution before a government agency or court shall bear the burden, by a preponderance of the evidence, of proving that the institution of purely public charity

Article 8, Section 2 of the Pennsylvania Constitution provides that, "[t]he General Assembly may exempt from taxation ... Institutions of purely public charity, but in the case of any real property tax exemptions **only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.**" (Emphasis added.) In *Hospital Utilization Project v. Commonwealth of Pennsylvania (HUP)*, 507 Pa. 1, 487 A.2d 1306 (1985), our Supreme Court determined that an entity qualified as a purely public charity under the Constitution if it met the following test:

1. Advances a charitable purpose;

2. Donates or renders gratuitously a substantial portion of its services;

3. Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

4. Relieves the government of some of its burden; and

5. Operates entirely free from profit motive.

Rather than adopting a more stringent test, Section 5 of Act 55, 10 P.S. § 375, adopted this test. This Court has followed that Constitutional mandate and the standards set forth in *HUP* in two cases that are quite similar factually to the case *sub judice* and has in both instances upheld the denial of a tax exemption for a facility on property that also maintains additional facilities that do qualify for a tax exemp-

tion based on the entity's classification as a purely public charity.

In *Appeal of Lutheran Social Services*, 114 Pa.Cmwlth. 628, 539 A.2d 895 (1988), Lutheran Social Services appealed from the denial of a real estate tax exemption for its 96–unit apartment building and 81 cottage units it operated as part of a retirement community for the elderly which also contained a nursing facility. The Board of Assessment reclassified the apartment building and cottages from tax exempt to taxable but did not change the status of the nursing facility from tax exempt. On appeal, we determined that the apartments were tax exempt because while the applicants paid a processing fee, they did not pay an admission fee and the fees did not cover the operating expenses of the apartments. Many of the residents were exonerated from paying increases in their monthly fees. The apartments operated at a deficit. As to the cottages, applicants paid an entrance fee ranging from $38,500 to $46,000 depending on the type of unit; no resident was ever admitted without paying the entrance fee; if the resident died, any balance became the property of Lutheran Social Services; and residents paid a monthly maintenance fee plus their own utilities. We stated:

The cottage operation at Luther Acres presents an entirely different situation. Even if the fact that the cottages pro-

does not comply with the requirements of section 5.

10 Pa.C.S. § 376(b). Chapel Pointe argues that nothing in the Constitution instructs the courts on the process to determine whether an institution is one of purely public charity, and the rebuttable presumption in Act 55 should apply because it is not being relied upon to ultimately determine whether it qualifies for a tax exemption, but only to establish the process through which the taxing authority must proceed to impose taxes on real property to determine that the real property is

taxable. That issue ignores that what this issue involves is not whether Chapel Pointe, an institution of purely public charity, which for the purposes of this case is conceded, but whether the independent living apartments are being used for charitable purposes. In any event, we need not address this issue because the facts are not in dispute, and this issue merely inquires whether those facts, as established, meet the legal standards for a purely public charity, making the presumption irrelevant.

vide housing for the elderly were held to satisfy the first *Hospital Utilization Project* criterion of advancing a charitable purpose, the cottage operation runs afoul of the second criterion, that of donating or rendering gratuitously a substantial portion of its services. The simple fact that the cottage operation consistently realizes a substantial profit demonstrates that no services are being rendered free to cottage residents. LSS's claim that it subsidizes cottage residents by not charging them $20 per month in taxes and by exonerating some from increases in the monthly maintenance fee is untenable . . .

The cottage operation sells something— housing for the elderly—at a profit, and LSS then uses that profit for the purposes above held to be charitable in nature. However, the situation would be no different if LSS conducted some other business on the premises, manufacturing or retailing for example, at a profit, and then donated that profit to its charitable activities. Such fund-raising would be laudable but not, in the legal sense, charitable.

*Id.* at 901–902. Relying upon *Lutheran Social Services,* we came to the same conclusion in *Appeal of Bethlen Home,* 125 Pa.Cmwlth. 315, 557 A.2d 828 (Pa.Cmwlth. 1989). In that case, Bethlen Home operated a facility that included a nursing home which provided intermediate and advanced nursing care as well as seven retirement cottages that consisted of two separate living units. The County of Westmoreland assessed the retirement cottages and the land on which they were erected for real estate taxes and Bethlen Home appealed. The appeal was denied and the trial court held that the retirement cottages were tax exempt. On appeal, we reversed based on the following facts: the residents had to be 65 years or older to reside in a cottage; they had to submit evidence of their finan-

cial ability to sustain independent living; they had to pay an entrance fee ranging from $25,000 to $45,500; no applicant ever took occupancy without paying the fee; and occupants paid a monthly service fee of $25 plus all of their utilities. We noted that although occupants were able to receive free nursing care in the nursing home at some time in the future, that fact was irrelevant to the determination of whether the cottage operation was of a purely public charity. Further, even though Bethlen repaired its cottages free of charge and provided lawn mowing and snow removal at no cost to the occupants, we concluded that those few services were insufficient to meet the second criterion of *HUP*.

■ While it was conceded that Chapel Pointe's assisted living and the skilled nursing facilities are used for a charitable purpose and the land on which they are located have been given a tax exemption, we are not required to exempt from taxation the independent living apartments or any other facilities on the same property, whether they be charitable or not, merely because they are located on the same property. Were we to find otherwise, any use could be placed on property that already has received a tax exemption for real estate based on a charitable exemption. Of course, if Chapel Pointe's purpose tips away from being charitable because of an accumulation of non-charitable activities or if a claim is made that it competes in its activities with "for profits," *see* Section 8(a) of Act 55, 10 P.S. § 378, then its entire exemption can be challenged.

■ Chapel Pointe then argues that it even if we look at the parcel and use separate and apart from that which has already been exempted, the independent living apartments meet the definition of a

purely public charity.[4] The only prong of the standard at issue in this case is whether Chapel Pointe donates or renders gratuitously a substantial portion of its services relative to the independent living apartments. Chapel Pointe contends that it has met this requirement under Section 5(d)(1)(iii) of Act 55, 10 P.S. § 376(d)(1)(iii), which provides that in order to prove that an institution renders gratuitously a substantial portion of its services, it may show that it provides wholly gratuitous goods or services to at least 5% of those receiving similar goods or services from the institution.

The trial court in this case found otherwise, determining that there was no evidence that Chapel Pointe was donating a substantial portion of its services to the residents living in the independent living apartments and, therefore, did not meet the definition of a purely public charity.[5] We agree. As the trial court stated:

> Chapel Pointe has not proven by credible evidence, under any standard, that it donates or renders gratuitously a substantial portion of its services to the residents of its apartments. No assistance is provided to any residents for the payment of their entrance fees. Very minimal assistance is provided to a few residents by adjusting their monthly rental fees. Some financially insignificant ancillary program benefits are provided for those residents who choose to participate. The apartment operation helps fund Chapel Pointe's nursing

home and assisted living compound. Chapel Pointe's convoluted effort to utilize the criteria in its unified financial statement to convenience us, based on a cost per day per resident analysis, that (1) the apartments operate as a loss, and (2) it renders gratuitously a substantial portion of services for the apartment residents, is not credible. Under Article 8, Section 2(a)(v) of the Pennsylvania Constitution, it is "only that portion of real property of [an] institution which is actually and regularly used" for "purely public charity," that is exempt from real property taxes. Thus, unlike the nursing home and the assisted living compound, the apartments and the land they are on do not qualify for a statutory real estate tax exemption.

Because there is substantial evidence in the record to support the trial court's determination, we will not disturb that determination on appeal.

Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this 15th day of June, 2004, the order of the Court of Common Pleas of Cumberland County, dated January 31, 2002, is affirmed.

Dissenting Opinion by Judge SIMPSON.

I respectfully dissent because I believe the thoughtful trial judge incorrectly ap-

---

4. Whether an institution is one of purely public charity is a mixed question of fact and law, and we are bound by the trial court's decision as long as there is no abuse of discretion and there is supporting evidence. *Concern–Professional Services for Children and Youth v. Board of Assessment Appeals of Berks County,* 127 Pa.Cmwlth. 79, 560 A.2d 932, *petition for allowance of appeal denied,* 524 Pa. 612, 569 A.2d 1370 (1989).

5. Although not before us, it also seems there is an issue as to whether Chapel Pointe's independent living apartments benefit a substantial and indefinite class of persons who are legitimate subjects of charity when they are required to pay a substantial entrance fee and monthly rental fee.

plied the constitutional tests for charitable tax exemption.

"An entity seeking a statutory exemption for taxation must first establish that it is a 'purely public charity' under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached." *Cmty. Options, Inc. v. Bd. of Prop. Assessment,* 571 Pa. 672, 676, 813 A.2d 680, 683 (2002).

In *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985), our Supreme Court set forth a five-part test for determining whether an entity qualifies as a "purely public charity" under the Pennsylvania Constitution:

> [A]n entity qualifies as a purely public charity if it possesses the following characteristics.
>
> (a) Advances a charitable purpose;
>
> (b) Donates or renders gratuitously a substantial portion of its services;
>
> (c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
>
> (d) Relieves the government of some of its burden; and
>
> (e) Operates entirely free from profit motive.

507 Pa. at 22, 487 A.2d at 1317 (*HUP* test). "For the [entity] to obtain the claimed exemption from taxation, it must affirmatively show that the *entire institution,* (1) is one of 'purely public charity'; (2) was founded by public or private charity; (3) is maintained by public or private charity." *Appeal of Lutheran Social Services,* 114 Pa.Cmwlth. 628, 539 A.2d 895, 897 (1988)(emphasis added), *quoting Appeal of Woods Schools,* 406 Pa. 579, 584, 178 A.2d 600, 602 (1962).

In addition to a determination as to the charitable status of the entire institution, there is also a constitutional test relating to the use of the parcel in question. Article VIII, Section 2(a)(v) of the Pennsylvania Constitution permits exemption from taxation of "only that portion of real property of such institution which is actually and regularly used for the purposes of the institution."

Here, the trial court confused the two constitutional inquiries. Because some of Chapel Pointe's real property already enjoys charitable tax exemption, the trial court was not asked to determine, and did not determine, whether the entire institution met the constitutional "purely public charity" test. Rather, it held the independent living unit part of the institution did not satisfy the test. Also, it did not determine whether the parcel in question "is actually and regularly used for the purposes of the institution." Instead, its parcel-specific inquiry focused on the charitable status.

*Lutheran Social Services,* a case discussed by the trial court, is instructive. Lutheran Social Services owned property on which was located a retirement community consisting of a nursing care facility, an apartment building and cottage units. The institution appealed the taxable reclassification of the apartment building and cottage parcels. This Court acknowledged that analysis of the entire institution was required. Thereafter, noting financial inconsistencies and operational distinctions between the apartments and cottages, the Court concluded that the apartment and cottage uses were in fact separate. Based on this conclusion, we analyzed each use separately. Ultimately, the Court held that the cottage operation did not donate or render gratuitously a substantial portion of its services.[1]

---

1. In addition, the generation of profit from the cottage operation subjected the parcel to

Our Supreme Court followed a similar process in *Appeal of Woods Schools,* in which an institution sought to extend charitable tax exemption for property surrounding a research center to its contiguous school property. The Court acknowledged the "entire institution" analysis. 406 Pa. at 582, 178 A.2d at 602. However, the Court agreed with the lower courts that the school was in fact a separate and distinct entity from the research center. *Id.* at 584, 178 A.2d at 603. On that basis, the Court reviewed the facts pertaining only to the school, ultimately concluding the school did not donate a substantial portion of its services.

As in *Appeal of Woods Schools* and *Lutheran Social Services,* the trial court here was required to apply the constitutional criteria to the entire institution unless the record supports an analysis of separate components.[2] Significantly, this approach is consistent with the approach for charitable tax exemption under the Institutions of Purely Public Charity Act,[3] known as Act 55. *Chartiers Valley Sch. Dist. v. Bd. of Assessment Appeals,* 794 A.2d 981 (Pa. Cmwlth.2002)(by statutory definition, basic unit of evaluation is corporation, association or trust, or other similar entity, not parts of entity).

Consistent with the forgoing analysis, and with the intent of harmonizing the

constitutional and statutory analyses, I would reverse and remand, with direction to apply an "entire institution" analysis to the constitutional questions, and with invitation to consider statutory tests thereafter.

Dissenting Opinion by Judge LEAVITT.

Respectfully, I dissent. The majority, as did the trial court, disregards the Institutions of Purely Public Charity Act, Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–385 (Act 55). Indeed, in deciding the tax exemption application of Alliance Home of Carlisle, Pennsylvania, t/a Chapel Pointe (Chapel Pointe) the majority declares Act 55 to be "irrelevant."[1] Our charge, however, is to give effect to statutes of the General Assembly.

Act 55 does not create a tax exemption. Exemptions are established in the appropriate taxing statute. Here, the exemption sought by Chapel Pointe was established in Section 204(a)(3) of the General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(a)(3), which exempts "institutions ... of charity" from the payment of real property tax.[2] Under Act 55, the substantive standards for determining whether Chapel Pointe may claim an exemption under Section 204(a)(3) are the standards of *HUP.*[3] *See* Section 5

---

taxation under Section 204 of the General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(b).

**2.** In fairness to the trial court, this Court departed from the "entire institution" analysis without explanation on occasion, especially where attention was not drawn to the entire institution because the appeal concerned only one of several parcels. *See e.g., Appeal of Bethlen Home,* 125 Pa.Cmwlth. 315, 557 A.2d 828 (1989); *Passavant Health Center v. Bd. of Assessment,* 93 Pa.Cmwlth. 575, 502 A.2d 753 (1985).

**3.** Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–85.

**1.** See n. 3 of majority opinion.

**2.** This exemption includes "the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity...." Section 204(a)(3) of the Assessment Law, 72 P.S. § 5020–204(a)(3).

**3.** *See Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*). In *HUP,* the Supreme Court, con-

of Act 55, 10 P.S. § 375. However, Act 55 covers new ground insofar as it establishes, for the first time, uniform *procedures* by which these determinations are to be made at the local level.

One of those procedures, applicable here, is the rebuttable presumption. Section 6(a) of Act 55 states as follows:

> (a) Presumption determination.—*An institution of purely public charity*[4] possessing a valid exemption from the tax imposed by Article II of the act of March 4, 1971 (P.L. 6, No. 2), known as the Tax Reform Code of 1971, *shall be entitled to assert a rebuttable presumption* regarding that institution's compliance with the criteria set forth in section 5 as follows:

(1) An institution of purely public charity that has annual program service revenue less than $10,000,000 shall be entitled to assert the presumption if the institution possesses a valid exemption under section 204(10) of the Tax Reform Code of 1971.

10 P.S. § 376(a)(1) (emphasis added). Chapel Pointe's annual revenue is less than $10,000,000, and it holds an exemption under Section 204(10) of the Tax Re-

form Code of 1971. However, the trial court held that Chapel Pointe, claiming an exemption for its independent living units had to prove, first, that these units, as a separate institution, satisfied the *HUP*[5] standards before the procedures in Act 55 could come into play. This circular exercise is affirmed by the majority.

In disallowing Chapel Pointe the Act 55 presumption, the trial court relied upon *Community Options, Inc. v. Board of Property Assessment*, 571 Pa. 672, 813 A.2d 680 (2002). In that case, the appellant asserted that Act 55 must be applied to all tax exemption cases arising after 1998,[6] to which the Supreme Court responded:

> However, we need not reach this argument because we have rejected the Commonwealth Court's reasoning in *Community Service Foundation* and the conclusion that Appellant is not a "purely public charity" under the *Hospital Utilization Project* test....

*Id.* at 683, 813 A.2d at 687. In short, *Community Options* does not support the trial court's conclusion that the holding in

struing Article VIII, Section 2 of the Pennsylvania Constitution, established a 5–point test for determining when a taxpayer is a "purely private charity" entitled to an exemption. Act 55 codifies the *HUP* test. It states its purpose to implementation of the "traditional legislative and judicial applications of the constitutional term 'institutions of purely public charity.'" Section 2(b) of Act 55, 10 P.S. § 372(b). *See also Selfspot, Inc. v. Butler County Family YMCA*, 818 A.2d 587, 593 (Pa. Cmwlth.2003), acknowledging that Act 55 codifies the *HUP* test.

4. An "institution of purely public charity" is defined in Section 3 of Act 55 to be an institution that "meets the criteria under section 5." 10 P.S. § 373.

5. The trial court held that before Chapel Pointe could invoke the rebuttable presumption, it first had to prove that its apartments

were themselves a "purely private charity" within the meaning of Article VIII, Section 2 of the Pennsylvania Constitution. Stated otherwise, the trial court simply disregarded Act 55.

6. At issue was a tax exemption for three years: 1996 to 1998. The trial court applied Act 55 to the application for 1998, which was the first year Act 55 became effective. It applied *HUP* to tax years 1996 and 1997, denying an exemption for those years. This Court reversed. The appellant appealed with respect to all three years. On appeal, the Supreme Court found that the trial court erred with respect to its application of the *HUP* test and that the taxpayer qualified for the exemption in all three years.

*HUP* trumps Act 55.[7] To the contrary, the Supreme Court did not reach the question of the scope of Act 55.

Where, as here, the General Assembly has codified a judicial interpretation of the constitution, it is appropriate to follow the terms of that statute. *See In re Sale No. 10,* 801 A.2d 1280, 1287–1288 (Pa.Cmwlth. 2002) (noting that the enactment of Section 607(a) of the Real Estate Tax Sale Law, Act of July 7, 1947, P.L. 1368, *as amended,* 72 P.S. §§ 5860.607, codified our Supreme Court's decision in *Tracy v. Chester County Tax Claim Bureau,* 507 Pa. 288, 489 A.2d 1334 (1985)). Indeed, our Supreme Court has held that legislative codifications of real estate tax exemption case law are "binding and conclusive until [shown] clearly and beyond all question to be in violation of the Constitution." *Young Men's Christian Association of Germantown v. City of Philadelphia,* 323 Pa. 401, 407, 187 A. 204, 207 (1936).

Nevertheless, where the Pennsylvania Constitution is silent on the *procedure* by which a constitutional right is to be determined, the General Assembly's authority is supreme.[8] *See Glancey v. State Employes' Retirement Board,* 530 Pa. 481, 502 n. 20, 610 A.2d 15, 26 n. 20 (1992) (stating that where the constitution is silent, the mechanics of pension forfeiture must be dictated by interpretation of the Pension Forfeiture Act); *Collins v. Commonwealth,* 262 Pa. 572, 575, 106 A. 229, 230 (1919) (stating that "[i]f the Constitution is silent on the subject, the legislative authority, being uncontrolled, is supreme").[9]

Act 55 is such legislative action. It established uniform procedures, including the use of presumptions, to be followed in making the determination of whether or not a tax exemption shall be granted. To cling to *HUP* as if Act 55 had not been enacted presumes that Act 55 is unconstitutional. However, we must presume it is constitutional. *Wilson Partners, L.P. v. Board of Finance & Revenue,* 558 Pa. 462, 471, 737 A.2d 1215, 1220 (1999).

The majority also fails to consider the regulatory environment in which Chapel Pointe operates. A continuing care community makes a promise not unlike that of an insurance company, which, in exchange for a premium payment, provides protection against future, unknown loss. When a resident enters a continuing care community, the resident receives a life estate in the community, enforceable by contract. This life estate includes future nursing home care, should the need develop, even if the resident lacks the funds to pay for such care at that point. So long as the resident remains in an independent living unit, Chapel Pointe must make services available to the resident such as on-site nursing, meals and housekeeping. If these facilities and services are not used by the resident of the independent living unit, Chapel Pointe still bears the expense of making them available. To compare an independent living unit in a continuing care community to a commercial apartment is the proverbial "apple to orange" comparison.

Indeed, to focus on services rendered to residents of independent living units, while

---

7. To the contrary, Act 55 implements the substance of the *HUP* holding.

8. It goes without saying that the judiciary has ultimate responsibility and authority to interpret the Pennsylvania Constitution. *Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 118 (Pa.Cmwlth.1998).

9. This Court has expressly recognized that Article VIII, Section 2 is not self-executing and that legislative standards for implementing the tax exemptions are appropriate to the extent they are constitutional. *Robert Morris College v. Board of Property Assessment, Appeals & Review, Allegheny County,* 5 Pa. Cmwlth. 648, 291 A.2d 567, 571 (1972).

they occupy those units, is to miss the purpose of a continuing care community. Persons enter such a community for the purpose of lifetime protections, which the community is contractually obligated to provide. This point was overlooked in *Appeal of Lutheran Social Services, East Region,* 114 Pa.Cmwlth. 628, 539 A.2d 895 (1988) and *Bethlen Home of Hungarian Reformed Federation of America,* 125 Pa. Cmwlth. 315, 557 A.2d 828 (1989). Accordingly, I do not agree that the outcome here should be determined by *Lutheran Social Services* or *Bethlen.*

In *Lutheran Social Services,* this Court held that a retirement community consisting of a nursing care facility, a 96–unit apartment building and 81 cottage units functioned as three separate operations and then evaluated each operation under the *HUP* test. We concluded that the apartments qualified for the tax exemption but the cottages did not because the residents in the cottages did not receive a substantial portion of their services free of charge. In *Bethlen,* relying on *Lutheran Social Services* and *Passavant Health Center v. Board of Assessment Revision of Taxes of Butler County,* 93 Pa.Cmwlth. 575, 502 A.2d 753 (1985), this Court again denied a tax exemption for that portion of a retirement community consisting of cottages.

First, the facts in *Lutheran Social Services* and *Bethlen* appear distinguishable. Unlike Chapel Pointe, Bethlen is not a licensed continuing care community subject to the rigors of regulation.[10] Second, the regulatory scheme applicable to a con-

tinuing care facility was not given any consideration in either *Lutheran Social Services* or *Bethlen.* Third, treating cottages as a separate institution is inconsistent with our holding in *Chartiers Valley School District v. Board of Property Assessment, Appeals, Review & Registry of Allegheny County,* 794 A.2d 981 (Pa. Cmwlth.2002), wherein, relying on Act 55, we held that the corporation, not a division or operational unit of the corporation, is the focus of the determination of whether an *institution* is one of purely public charity.

More to the point, *Lutheran Social Services* and *Bethlen* are not consistent with our Supreme Court's holding in *Unionville–Chadds Ford School District v. Chester County Board of Assessment Appeals,* 552 Pa. 212, 714 A.2d 397 (1998) that courts must look to the institution as a whole to determine its status as a purely public charity. Indeed, this Court explained this examination as follows:

> The presence of two potentially profit-making activities, a garden shop and restaurant, does not change *the essential nature of Longwood as a whole, as an institution that operates free from private profit motive.* Regardless of whether it shows a profit, the garden shop primarily advances and supports the institution's educational purposes through its sale of books and films on horticulture-related topics; in addition, the shop carries items such as film and rain gear for the convenience of visitors to the gardens. Profits from the garden shop are applied against the institution's general operating expenses.

---

10. Chapel Pointe holds a license issued by the Pennsylvania Insurance Department pursuant to the Continuing Care Provider Registration and Disclosure Act, Act of June 18, 1984, P.L. 391, 40 P.S. §§ 3201–3225. Legislative findings therein note that continuing care communities have become an important and needed alternative for the long-term residen-

tial, social and health maintenance for the Commonwealth's senior citizens. Under this act, Chapel Pointe is regulated to ensure its financial solvency and that its residency agreements meet certain standards. Further, it is required to offer independent living units, assisted living units and full nursing home care to residents.

*Unionville–Chadds Ford School District v. Chester County Board of Assessment Appeals*, 692 A.2d 1136, 1143 (Pa.Cmwlth. 1997) (emphasis added) (footnote omitted).[11] Accordingly, it is error to treat the independent living units at Chapel Pointe as a separate institution, even if they should be found to operate at a profit.

To conclude, I believe this matter should be remanded to the trial court for a new hearing that conforms to the procedures required by the General Assembly in Act 55. The trial court should, first, determine whether Chapel Pointe is an institution of purely public charity, giving it benefit of the rebuttable presumption set forth in Section 6(a)(1) of Act 55, 10 P.S. § 376(a)(1). Consistent with *Unionville–Chadds Ford*, the trial court should consider the totality of the circumstances in deciding whether the independent living units transform the essential nature of Chapel Pointe from an institution that operates free of the profit motive to something else.[12] However, should the trial court determine Chapel Pointe to be an institution of purely public charity, its task would not be complete. This is because under Act 55, a *"parcel or part of the parcel* [used] for purposes other than the charitable purpose of that institution" can be subjected to real estate taxes. Section 5(h)(1) of Act 55, 10 P.S. § 375(h)(1) (emphasis added). If the independent living units do not advance the charitable purpose[13] of Chapel Pointe, then the parcel on which they sit should be taxed. If those independent living units do advance the charitable purpose of Chapel Pointe, then that parcel should be exempt along with the rest of the institution.

For these reasons, I dissent. I would reverse the trial court and remand for another hearing on whether Chapel Pointe is a purely public charity and whether its independent living units advance Chapel Pointes charitable efforts on behalf of the elderly, considering the totality of circumstances.

11. The Supreme Court affirmed, focusing on the question of whether the beneficiaries of a purely public charity must be the poor, the infirm or the needy. The Court held that "the fundamental character of a purely public charity [is] to benefit the general public." *Unionville–Chadds Ford School District*, 552 at 220, 714 A.2d at 401. In sum, in the *Unionville–Chadds Ford School District* cases, the appellate courts of Pennsylvania examined the institution as a whole to determine its status as a purely public charity. The bookstore and restaurants, not themselves charitable, advanced the institution's purpose and, therefore, did not undermine the claim of Longwood Gardens to a tax exemption.

12. In support of application, Chapel Pointe submitted a report showing that, in the aggregate, 17.94% of Chapel Pointe's costs of providing goods and services to its residents were uncompensated. In the nursing home, 15.78% of the total costs were uncompensated; in assisted living, 23.05%; and in independent living, 18.66%. The report also concluded that a large number of residents were subsidized. It showed that 70.63% of residents paid less than 100% of the costs of their goods and services; 51.95% of residents paid less than 90% of those costs. On average, 63.72% of the residents paid less than the costs of the goods and services provided to them by Chapel Pointe.

13. This Court and our Supreme Court have given a liberal construction to "public purposes" to include all uses within the powers granted to the body. *Delaware County Solid Waste Authority v. Berks County Board of Assessment Appeals*, 534 Pa. 81, 87–88, 626 A.2d 528, 531–532 (1993); *Dauphin County General Authority v. Dauphin County Board of Assessments*, 768 A.2d 895 (Pa.Cmwlth.2000). Logically, this same liberal construction should be applied to a private institution claiming to be an institution of purely public charity.