919 A.2d 206

**ALLIANCE HOME OF CARLISLE, PA,
t/a Chapel Pointe, Appellant,**

v.

**BOARD OF ASSESSMENT APPEALS, Carlisle
Area School District, Borough of Carlisle,
and Cumberland County, Appellees.**

Supreme Court of Pennsylvania.

Argued May 17, 2005.

Decided April 17, 2007.

Steven T. Hanford, Esq., Capozzi & Associates, P.C., Harrisburg, for Alliance Home of Carlisle t/a Chapel Pointe, Appellant.

Louis J. Capozzi, Jr., Esq., Capozzi & Associates, P.C., Harrisburg, for Alliance Home of Carlisle t/a/ Chapel Pointe, Appellant.

Thomas E. Flower, Esq., Carlisle, for Board of Assessment Appeals, et al., Appellee.

Robert C. Saidis, Esq., Saidis, Flower & Lindsay, Carlisle, for Board of Assessment Appeals, et al., Appellee.

James D. Flower, Esq., Saidis, Shuff, Flower & Lindsay, Carlisle, for Board of Assessment Appeals, et al., Appellee.

David Christopher Marshall, Esq., Latsha, Davis, Yohe & McKenna, P.C., Mechanicsburg, for amicus curiae Pennsylvania Association of Non–Profit Homes for the Aging, Appellant.

Kimber Lynn Latsha, Esq., Latsha, Davis, Yohe & McKenna, P.C., Mechanicsburg, for amicus curiae Pennsylvania Association of Non–Profit Homes for the Aging, Appellant.

Neva L. Stanger, Esq., Campbell, Durrant & Beatty, P.C., Pittsburgh, for amicus curiae Pennsylvania League of Cities and Municipalities.

Vicki Linn Beatty, Esq., Campbell, Durrant & Beatty, P.C., Pittsburgh, for amicus curiae Pennsylvania League of Cities and Municipalities.

Sean Ashley Fields, Esq., New Cumberland, for amicus curiae Pa. School Boards Association, Appellee.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice CASTILLE.[1]

This appeal involves the interplay of the "institution of purely public charity" real estate tax exemption permitted by Article VIII, Section 2(a)(v) of the Pennsylvania Constitution [2] and the Institutions of Purely Public Charity Act, Act of November 26, 1997, P.L. 508, 10 P.S. § 371 *et seq.* ("Act 55"). Appellant, Chapel Pointe, owns and operates a licensed continuing care retirement community ("CCRC") that includes a skilled nursing facility, an assisted living facility, and an

---

1. This matter was reassigned to this author.

2. Article VIII, Section 2(a)(v) provides as follows:
    (a) The General Assembly may by law exempt from taxation:
    * * * *
    (v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.
    PA CONST. art. VIII, § 2(a)(v).

independent living apartment facility. Appellant had previously been determined to be an institution of purely public charity and both its skilled nursing facility and its assisted living facility had been deemed exempt from real estate taxation. The dispute in the case *sub judice* arises from the propriety of the determination of the tribunals below that appellant's independent living facility, which they viewed in isolation from the rest of the corporate community, did not qualify as an institution of purely public charity and, therefore, the parcel of property occupied by the independent living facility was not tax exempt. For the reasons that follow, we reverse.

Appellant is a non-profit corporation that was formed in 1944 to provide care for the elderly and infirm. Appellant's CCRC includes a 59–bed skilled nursing home, a 53–bed assisted living compound, and 93 apartments that function as an independent living community. In 1997, appellant requested a tax exemption for the parcel consisting of the independent living community. The Cumberland County Board of Assessment ("Board") denied the request, and appellant did not appeal. In 2001, following the enactment of Act 55, appellant again petitioned the Board for a real estate tax exemption for its independent living community. Appellant argued that its institution, as an entire entity, satisfied both the constitutional and statutory requirements for tax exemption by providing residents with, *inter alia,* uncompensated goods and services in excess of five percent of the cost of such goods and services. The Board denied the request concluding that the issue was controlled by the *res judicata* effect of its 1997 decision.

Appellant appealed to the Court of Common Pleas of Cumberland County. The December 6, 2001 hearing *de novo* revealed that the minimum age requirement for admission to the independent living apartments is 62. Prospective residents are required to provide appellant with detailed financial statements, and appellant does not admit anyone who cannot pay the entrance fee initially, or whose financial information suggests an inability to pay the ensuing monthly fees. The

entrance fee ranged from $37,000 for an efficiency apartment to $73,000 for some two-bedroom apartments. Once accepted, apartment residents are given priority should a need arise to move either to the assisted living compound or to the skilled nursing facility. Appellant's Executive Director, John Hendrickson, explained the entrance fee as follows:

> There is a limit to the amount of benevolent care that we can provide. We're not a large facility with a huge endowment that can provide benevolent care without using monies coming in from operations. So we want to look at and be sure that we're going to be able to provide the benevolent care that we've already committed to, and so we have to be sure that there are people who are coming in [who] are private pay. The other reason is that we want to be sure that we have something to compare a disclosure to now should they apply for a different level of living down the road and there is a significant difference in the amount of assets that are there. Again, we do not want to give charity to just anyone. We want to give charity to or financial assistance to people that truly qualify for financial assistance.

R.R. 157–158.

Appellant reserved one apartment unit as a model. The total amount of entrance fees generated by the remaining 92 apartments was $5,721,000. Appellant placed each apartment on a 40–year depreciation schedule with the average stay for a resident being 3 to 4 years. Residents are permitted to stay in their apartments for as long as they are safe, as determined by appellant. Appellant amortizes entrance fees over the life expectancy of the resident and there is a recalculation each year so that, for accounting purposes, a resident never outlives his or her life expectancy. Appellant amortizes the entrance fee at 20% each year prorated monthly for 5 years. Thus, if a resident leaves his apartment within 5 years, a prorated amount of the entrance fee is refunded; but after 5 years, no portion of the fee is refunded. All income earned on entrance fees is retained by appellant.

The uniform monthly fee charged for each apartment, which is required in addition to the one-time entrance fee, is designed to cover costs. Thus, monthly fees are increased as needed. As of the hearing date, the monthly fee was $599 for one person and an additional $130 for each additional occupant. Appellant provides financial assistance to residents who have difficulty meeting their monthly obligation, albeit with the understanding that appellant could seek reimbursement. Residents struggling financially are also required to apply for financial assistance from their families, churches, and public welfare agencies.

Residents are further required to prepare and submit an annual financial statement and a statement of physical and mental health. Failure to make such disclosures constitutes grounds for residential termination. However, no resident had ever been asked to leave an apartment because of financial problems. Also, some residents facing financial problems had not had their monthly fee raised by appellant, and several residents received some financial assistance from appellant toward their monthly fees.

Fifty-five percent of the apartment residents had received uncompensated services from appellant, such as assistance with taking medications, participation in social activities, and advice regarding family or financial problems. These uncompensated services constitute more than 10% of the aggregate cost of care. Appellant also provides maintenance for all common areas and for each apartment, and pays all residents' utility and real estate tax bills.

Appellant's 2000 financial statement indicated that it allocated its administrative costs based on total operating costs, with approximately 68% of administrative costs allocated to the nursing home, 22% to the assisted living compound, and 9% to the independent living apartments. Appellant produced testimony that, for the years 1998, 1999 and 2000, it realized an operating loss and had relied upon contributions and bequests to offset that loss. The Board and Cumberland County introduced evidence that the assessed value of the 93 apartments in the year 2000 was $2,593,350. A survey of rental

prices in the area revealed that the average rental was $350 per month and $450 per month for 1–bedroom and 2–bedroom apartments, respectively.

Following the hearing *de novo*, the trial court affirmed the Board's decision. The trial court first found that appellant was not entitled to a rebuttable presumption that it was an institution of purely public charity under Section 376 of Act 55.[3] The court opined that the question of appellant's status as a purely public charity first had to be answered within the meaning of Article VIII, Section 2(a)(v) of the Pennsylvania Constitution. The court then discussed at length this Court's leading precedent concerning the constitutional test for a purely public charity, *i.e.*, *Hospital Utilization Project v. Commonwealth of Pennsylvania*, 507 Pa. 1, 487 A.2d 1306 (1985) ("*HUP*"), and two subsequent Commonwealth Court cases involving similar types of facilities, where exemption was denied for independent living components of retirement communities, *i.e.*, *Appeal of Lutheran Social Services*, 114 Pa. Cmwlth. 628, 539 A.2d 895 (1988), and *Appeal of Bethlen Home*, 125 Pa.Cmwlth. 315, 557 A.2d 828 (1989). The trial court did not then return to the question it initially posed, *i.e.*, whether appellant, as a corporate entity, qualified as an institution of purely public charity, but instead focused on the

**3.** Section 376 provides, in pertinent part, as follows:

(a) **Presumption determination.**—An institution of purely public charity possessing a valid exemption from the tax imposed by Article II of the act of March 4, 1971 (P.L. 6, No. 2), [ ] known as the Tax Reform Code of 1971, shall be entitled to assert a rebuttable presumption regarding that institution's compliance with the criteria set forth in section 5 [*i.e.*, criteria which determine whether an institution is a "purely public charity"] as follows:

(1) An institution of purely public charity that has annual program service revenue less than $10,000,000 shall be entitled to assert the presumption if the institution possesses a valid exemption under section 204(10) of the Tax Reform Code of 1971.

\* \* \*

(b) **Burden of proof.**—If an institution of purely public charity asserts a presumption under subsection (a), a political subdivision challenging that institution before a government agency or court shall bear the burden, by a preponderance of the evidence, of proving that the institution of purely public charity does not comply with the requirements of section 5.

10   P.S. § 376(a)(1) & (b).

independent living apartments in isolation from the rest of the institution. The court concluded that appellant had "not proven by credible evidence, under any standard" that it donated or rendered gratuitously a substantial portion of its services to the apartment residents. The court noted that appellant provided no assistance respecting its entrance fee, charged a monthly rental fee which was substantially higher than the norm for rental in the Carlisle area, and provided minimal assistance to but a few residents by adjusting their monthly fees. The court also noted financially insignificant ancillary program benefits, which were provided for residents who chose to participate. In the trial court's view:

> This system gives older people, at a considerable costs [sic], a safe comfortable place to live, it provides ancillary services for a charge, and residents get priority for transition into the assisted living compound and/or nursing home if the unfortunate need arises. The system provides a substantial amount of money for [appellant,] and a steady source of future occupants of its assisted living compound and nursing home.

Trial court slip op. at 17. The trial court concluded that the apartment operation helped fund appellant's nursing home and assisted living compound but that the parcel upon which the apartments stood, "unlike the nursing home and the assisted living compound," did not qualify for the charitable real estate tax exemption.

On further appeal, the Commonwealth Court, sitting *en banc,* affirmed in a 5–2 published opinion. *Alliance Home of Carlisle v. Bd. of Assessment Appeals,* 852 A.2d 428 (Pa. Cmwlth.2004). The majority preliminarily addressed appellant's argument that the trial court had erred in rejecting its claim that it was entitled to a rebuttable presumption under Section 376 of Act 55 that it was an institution of purely public charity because it previously was found to be such an institution regarding its other facilities and with respect to other taxes. The majority concluded that it did not need to decide this question because appellant's status as an institution of purely public charity was conceded, while the disputed issue

was "whether the independent living apartments are being used for charitable purposes." 852 A.2d at 432 n. 3. That question, in the majority's view, required only a determination of whether the undisputed facts "meet the legal standards for a purely public charity, making the presumption irrelevant." *Id.*

The majority then turned to appellant's argument that the trial court had erred in denying it a tax exemption by looking separately at the parcel of land on which the independent living apartments are located, rather than treating appellant as a single institution in evaluating its claim of entitlement to tax exemption for the entire parcel. The majority noted that, under this Court's decision in *HUP*, an entity qualifies as an institution of purely public charity for constitutional purposes if it:

1. Advances a charitable purpose;

2. Donates or renders gratuitously a substantial portion of its services;

3. Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

4. Relieves the government of some of its burden; and

5. Operates entirely free from profit motive.

487 A.2d at 1317. The majority then construed Section 5 of Act 55, 10 P.S. § 375 (entitled "Criteria for institutions of purely public charity"), as having adopted the *HUP* test rather than a "more stringent test" for determining if an institution qualified as a purely public charity. *See* 10 P.S. § 375(b-f).[4] The majority emphasized that the Commonwealth Court has followed the constitutional mandate and the *HUP* standard as demonstrated by the same two factually similar cases relied upon by the trial court, *i.e.*, *Appeal of Lutheran Social Services* and *Appeal of Bethlen Home.*

---

**4.** Subsections (b) through (f) do indeed address the five factors set forth in *HUP* (albeit in a different order); however, the statute goes into greater detail as to each factor. Thus, for example, subsection (b), concerning the requirement of advancing a charitable purpose, lists six approved charitable purposes.

In *Appeal of Lutheran Social Services,* taxpayer Lutheran Social Services appealed the denial of a real estate tax exemption for a 96–unit apartment building and 81 cottage units it operated as part of a retirement community, which also contained a nursing facility. The local Board of Assessment reclassified the apartment building and cottages from tax exempt to taxable but did not change the status of the nursing facility from tax exempt. On appeal, the Commonwealth Court determined that the apartments were tax exempt as well because apartment applicants did not pay an admission fee and the fees they did pay did not cover the operating expenses of the apartments. Moreover, many residents were forgiven from paying increases in monthly fees and the apartments operated at a deficit. As for the cottages, however, the court noted that applicants were required to pay an entrance fee ranging from $38,500 to $46,000, depending on the type of unit, and no resident was ever admitted without paying the entrance fee. The entrance fees were placed in a reserve account, from which a one percent per month deduction per unit was made as a bookkeeping matter. If a cottage resident died, any balance of his entrance fee became the property of Lutheran Social Services. Finally, residents paid a monthly maintenance fee plus utilities. The court found that, because the cottage complex realized a substantial profit, it did not donate or render gratuitously a substantial portion of its services, and therefore, the cottage portion of the real property was not a purely public charity entitled to the real estate tax exemption.

In *Appeal of Bethlen Home,* taxpayer operated a facility that included a nursing home, which provided intermediate and advanced nursing care, as well as seven retirement cottages each consisting of two separate living units. The county assessed the retirement cottages and the land on which they were erected for real estate taxes and Bethlen Home appealed. The local Board denied the appeal, but on further review, the trial court held that the cottages were tax exempt. The Commonwealth Court reversed, holding that the cottage operation was not a purely public charity because: residents were

required to be 65 years or older to reside in a cottage; they had to submit evidence of their financial ability to sustain independent living; they had to pay an entrance fee ranging from $25,000 to $45,500; no applicant ever took occupancy without paying the fee; and residents paid a monthly service fee of $25 plus their utilities. The fact that cottage residents received free nursing care in the nursing home was deemed irrelevant to the determination of whether the cottage operation qualified as a purely public charity.

In light of these cases, the *en banc* majority below noted that, although appellant's assisted living and skilled nursing facilities were used for a charitable purpose, and the land on which they are located had been deemed tax exempt, these facts did not ineluctably render tax exempt the independent living apartments or any other facility located on appellant's property. To hold otherwise, the majority stressed, would mean that "any use" could be placed on property of an entity that already had received a charitable tax exemption without negating that exemption. The majority then turned to the question it deemed controlling: whether the independent living apartments and the land they occupy on their own met the definition of a purely public charity. The only prong of the *HUP* /Act 55 test at issue respecting the apartments, the majority noted, was whether appellant donated or rendered gratuitously a substantial portion of its services. The majority answered that question in the negative, citing the trial court's analysis, which we have summarized earlier in this Opinion. *Alliance Home,* 852 A.2d at 434–35.

Judges Simpson and Leavitt filed separate dissenting opinions. In Judge Simpson's view, the trial court confused two distinct constitutional inquiries: *i.e.,* (1) whether an entity is an institution of purely public charity for tax exemption purposes, and (2) whether a particular parcel of property, owned by an institution of purely public charity, qualifies for tax exemption. As Judge Simpson explained:

Because some of Chapel Pointe's real property already enjoys charitable tax exemption, the trial court was not asked to determine, and did not determine, whether the

entire institution met the constitutional "purely public charity" test. Rather, it held the independent living unit part of the institution did not satisfy the test. Also, it did not determine whether the parcel in question "is actually and regularly used for the purposes of the institution." Instead, its parcel-specific inquiry focused on the charitable status.

852 A.2d at 436 (Simpson, J., dissenting). Judge Simpson stressed that the trial court was required to apply the constitutional criteria to the entire institution unless the independent living facility was in fact a separate and distinct institution. Judge Simpson would have reversed and remanded to the trial court to conduct an "entire institution analysis." *Id.* at 435–37.

Judge Leavitt's dissent first noted that she believed the majority erred in deeming Act 55 to be irrelevant. In Judge Leavitt's view, Act 55 "cover[ed] new ground" insofar as it established uniform procedures to determine whether a given property should be deemed tax exempt.[5] *Id.* at 438 (Leavitt, J., dissenting). Because the Constitution is silent respecting the procedure by which charitable exemptions are to be determined, Judge Leavitt opined, the General Assembly's authority to address such matters via legislation is "supreme." *Id.* at 439. Act 55 represents just such "legislative action," Judge Leavitt continued, it is presumptively constitutional, and to "cling to *HUP* as if Act 55 had not been enacted [wrongly] presumes that Act 55 is unconstitutional." *Id.* Judge Leavitt then noted that, in the case *sub judice,* appellant satisfied the elements entitling it to the Act 55 rebuttable presumption that it is an institution of purely public charity, yet both the trial court and the Commonwealth Court majority denied it the benefit of the presumption, and then required appellant to prove that its independent living facility, considered as if it comprised a separate institution, satisfied the *HUP* standard. *Id.* at 437–39.

5. Judge Leavitt noted that Act 55 did not create the exemption at issue; the General County Assessment Law is the statutory source for the exemption. 852 A.2d at 437, citing 72 P.S. § 5020–204(a)(3).

Judge Leavitt also opined that the majority ignored the "regulatory environment" in which licensed CCRCs operate. Judge Leavitt noted that appellant was licensed under the Continuing Care Provider Registration and Disclosure Act ("CCPRDA"), 40 P.S. § 3201 *et seq.*, and that, pursuant to that Act, appellant: "is regulated to ensure its financial solvency and that its residency agreements meet certain standards. Further, it is required to offer independent living units, assisted living units and full nursing home care to residents." 852 A.2d at 440 n. 10.[6] CCRCs make a promise of protection against future, unknown difficulties. When a resident enters a CCRC, Judge Leavitt explained, he "receives a life estate in the community, enforceable by contract," which encompasses future nursing home care (should the need develop) and services such as on-site nursing, meals and housekeeping. *Id.* at 439. Even if a resident does not make use of the services, the CCRC "still bears the expense of making them available." *Id.* In Judge Leavitt's view, it was error to treat appellant's independent living facility as a separate institution, even if the facility operated at a profit: "to focus on services rendered to residents of independent living units, while they occupy those units, is to miss the purpose of a continuing care community. Persons enter such a community for the purpose of lifetime protections, which the community is contractually obligated to provide." *Id.* Judge Leavitt noted that this point concerning the nature of CCRCs, and the regulatory scheme applicable to them, was "overlooked" by both *Appeal of Lutheran Social Services* and *Appeal of Bethlen Home,* a circumstance that rendered those cases non-controlling. *Id.* at 439–40.

Judge Leavitt also suggested that the *Appeal of Lutheran Social Services* and *Appeal of Bethlen Home* decisions were distinguishable because, *inter alia,* (1) treating the independent living cottages at issue in those cases as separate institutions is inconsistent with *Chartiers Valley School District v.*

6. *See* 40 P.S. § 3204 (requiring certificate of authority to engage in business of providing continuing care); *id.* § 3207 (requiring disclosure statements to prospective resident); *id.* § 3209–3213, 3216 (financial requirements and restrictions); *id.* § 3214 (dictating what must be included in resident's continuing care agreements).

*Board of Property Assessment, Appeals, Review and Registry,* 794 A.2d 981 (Pa.Cmwlth.2002), which held, under Act 55, that the corporation, and not a division or operational unit of the corporation, is the focus of the determination of whether an *institution* is one of purely public charity, and (2) the cases were inconsistent with *Unionville–Chadds Ford School District v. Chester County Board of Assessment Appeals,* 692 A.2d 1136 (Pa.Cmwlth.1997), *aff'd,* 552 Pa. 212, 714 A.2d 397 (1998), which stressed looking to the institution as a whole in determining purely public charity status. Thus, in Judge Leavitt's view, it was error to treat appellant's independent living facility as a separate institution.

In conclusion, Judge Leavitt would have remanded for a new hearing conforming to the Act 55 procedures—*i.e.,* the trial court should first determine whether appellant is an institution of purely public charity, in the process giving it the benefit of the Section 376(a)(1) rebuttable presumption; and the court would then have to determine whether the "parcel or part of the parcel [at issue is used] for purposes other than the charitable purpose of that institution." *See* 10 P.S. § 375(h)(1). If the independent living units do not advance the charitable purpose, the parcel is taxable; if the units do advance the charitable purpose, however, the parcel should be deemed tax exempt. *Alliance Home,* 852 A.2d at 440–41.

Appellant filed a petition for allowance of appeal, which this Court granted, limited to two interrelated questions: (1) whether appellant was required under Article VIII, Section 2(a)(v) of the Pennsylvania Constitution to demonstrate that the parcel in question independently served a charitable purpose in order for the tax exemption to apply; and (2) if the answer to the first question is negative, whether the Commonwealth Court erred in holding that the statutory presumption in 10 P.S. § 376 is irrelevant. Because the issues involve the proper interpretation of constitutional and statutory provisions, they pose questions of law. As such, this Court's scope of review is plenary and our standard of review is *de novo. Stilp v. Commonwealth,* 588 Pa. 539, 905 A.2d 918, 930 (2006).

■ To provide context for the parties' arguments, an understanding of the relevant constitutional taxing structure is helpful. Taxes, including real estate taxes, generate the revenue necessary to provide for governmental services. The permissive language in Article VIII, Section 2(a)(v) of the Pennsylvania Constitution authorizes, but does not require, the General Assembly to exempt certain property of certain charitable organizations from real estate taxes. *See also City of Philadelphia v. Barber*, 160 Pa. 123, 28 A. 644, 644–45 (1894) ("The constitution exempts nothing; it merely permits the legislature to exempt, within the lines laid down for its guidance") (construing Constitution of 1874); *Appeal of Donohugh*, 86 Pa. 306, 309 (1878) (same). Article VIII, Section 2(a)(v) thus allows for a legislatively-approved exception to the general rule that all real estate in Pennsylvania is to be taxed uniformly upon the same class of subjects. The general rule of tax uniformity is embodied in Article VIII, Section I of the Constitution: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Like many other constitutional provisions first adopted in the Constitution of 1874, the Uniformity Clause sought to address and eradicate specific legislative practices of the then-recent past. As this Court noted in *White v. Smith*, 189 Pa. 222, 42 A. 125, 125 (1899): "Previous to the constitution and Act of 1874, the legislature, by special act, relieved from taxation just what property it saw fit, whether the property was charitable, religious, or even devoted solely to purposes of corporate or private gain. The legislative habit had grown into a great abuse. Then came the new constitution, which at once put a stop to the abuse of power by the legislature." *Accord Fox's Appeal*, 112 Pa. 337, 4 A. 149, 153 (1886) (Uniformity Clause "was intended to and does sweep away forever the power of the legislature to impose unequal burdens upon the people under the form of taxation. The evils which led up to its incorporation into the organic law are well known. The burden of maintaining the state had been, in repeated instances, lifted from the shoulders of favored classes, and thrown upon the remainder of the community. This was done by

means of favoritism and class legislation. [The Uniformity Clause] was intended to cut up this system by the roots...."). The proper interplay between taxpayers' shared and uniform obligations, and the constitutional recognition that it may be appropriate, in the judgment of the General Assembly, to exempt certain charitable organizations that provide a level of public, quasi-governmental service, has been described by this Court as follows:

> Taxes are not penalties, but are contributions which all inhabitants are expected to make (and may be compelled to make) for the support of the manifold activities of government. Every inhabitant and every parcel of property receives governmental protection. Such protection costs money. When any inhabitant fails to contribute his share of the costs of this protection, some other inhabitant must contribute more than his fair share of that cost. There are substantial reasons why an institution wholly devoted to public charity should be exempt from taxation, since one of the duties of the government is to provide food and shelter for the poor. Any institution which by its charitable activities relieves the government of part of this burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a "quid pro quo" for its services in providing something which otherwise the government would have to provide.

*Young Men's Christian Ass'n of Germantown v. City of Philadelphia*, 323 Pa. 401, 187 A. 204, 210 (1936), *disproved of on other grounds*, *West Allegheny Hosp. v. Bd. of Prop. Assessment, Appeals and Review*, 500 Pa. 236, 455 A.2d 1170 (1982).

The General Assembly acted soon after the adoption of the Constitution of 1874 to enact enabling legislation exempting "institutions of learning, benevolence or charity" from taxation.[7] That legislation, however, did not make direct reference

---

7. In the Constitution of 1874, the Uniformity Clause and the charitable exemption were contained within the same section, *i.e.*, Article IX, Section 1, which provided: "All taxes shall be uniform upon the same class of subjects, within the territorial limits of the authority levying the

to the constitutional term "institutions of purely public charity" nor did it undertake to define that term, which was not itself separately defined in the constitutional text. The current statutory authorization for charitable exemption is contained in the General County Assessment Law, Act of May 22, 1933, P.L. 853, 72 P.S. § 5020–1 *et seq.* As subsequently amended, this statute renders "exempt from all county, city, borough, town, township, road, poor and school tax" various institutions and property, including, "[a]ll institutions of learning, benevolence, or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity" provided, however, "[t]hat the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose". *Id.* § 5020–204(a)(3). Like the original Act of 1874, the Assessment Law neither employed the constitutional term "institution of purely public charity" nor did it undertake to define that term. Thus, over the years, and under both legislative enactments giving effect to the permitted constitutional exemption, the judicial branch has faced the task of giving meaning to the constitutional restriction on a case-by-case basis, and thereby determining which institutions should enjoy charitable exemp-

tax, and shall be levied and collected under general laws; but the General Assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, and institutions of purely public charity." *Id.*

The 1874 Act provided, in pertinent part, that "all churches, meeting-houses, or other regular places of stated worship, with the grounds thereto annexed, necessary for the occupancy and enjoyment of the same; ... all hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence or charity, with the grounds thereto annexed, and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity; ... are hereby exempted from all and every county, city, borough, road, school and poor tax. ..." Act of May 14, 1874, P.L. 158. *See White v. Smith,* 42 A. at 126 (quoting Act of May 14, 1874, P.L. 158). *See generally* Loren D. Prescott, *Pennsylvania Charities, Tax Exemption, and the Institutions of Purely Public Charity Act,* 72 TEMP. L.REV. 951, 954–56 nn. 19–25 and accompanying text (2000).

tions. *See, e.g., White v. Smith,* 42 A. at 126 ("This at once imposed upon the courts a most difficult and often perplexing duty of interpretation from the facts in the cases as they arose. No hard and fast rule adapted to the varying facts of the different cases could at once be confidently laid down."). Ultimately, in *HUP,* a case involving a claim for charitable exemption from sales and use tax, this Court reviewed and condensed our century-long experience with the constitutional phrase, setting forth a five-part test for determining whether an entity qualifies as an "institution of purely public charity" under the Pennsylvania Constitution.

Twelve years after *HUP* was decided, in 1997 the General Assembly enacted Act 55, the Institutions of Purely Public Charity Act, and thereby weighed in on questions affecting determinations of charitable exemption which had, to that point, been left to the realm of the judiciary. Act 55 begins with the following statement of findings and declaration of legislative intent:

### § 372. Legislative intent

**(a) Findings.**—The General Assembly finds and declares as follows:

(1) It is in the best interest of this Commonwealth and its citizens that the recognition of tax-exempt status be accomplished in an orderly, uniform and economical manner.

(2) For more than 100 years, it has been the policy of this Commonwealth to foster the organization and operation of institutions of purely public charity by exempting them from taxation.

(3) Because institutions of purely public charity contribute to the common good or lessen the burden of government, the historic policy of exempting these institutions from taxation should be continued.

(4) Lack of specific legislative standards defining the term "institutions of purely public charity" has led to increasing confusion and confrontation among traditionally tax-exempt institutions and political subdivisions to the detriment of the public.

(5) There is increasing concern that the eligibility standards for charitable tax exemptions are being applied inconsistently, which may violate the uniformity provision of the Constitution of Pennsylvania.

(6) Recognizing the interest of the taxpayers in a fair and equitable system of property tax assessment and the attendant statutory requirements for the political subdivision responsible for maintaining real property assessment rolls to administer the system of property assessment, this act shall not in any way limit the responsibilities, prerogatives or abilities of political subdivisions with respect to the determination of or challenges to the taxable status of a parcel of property based on the use of the parcel or part of the parcel of property.

(7) Institutions of purely public charity benefit substantially from local government services. These institutions have significant value to the Commonwealth and its citizens, and the need exists for revenues to maintain local government services provided for the benefit of all citizens, including institutions of purely public charity. It is the intent of this act to encourage financially secure institutions of purely public charity to enter into voluntary agreements or maintain existing or continuing agreements for the purpose of defraying some of the cost of various local government services. Payments made under such agreements shall be deemed to be in compliance with any fiduciary obligation pertaining to such institutions of purely public charity, its officers or directors.

(b) Intent.—It is the intent of the General Assembly to eliminate inconsistent application of eligibility standards for charitable tax exemptions, reduce confusion and confrontation among traditionally tax-exempt institutions and political subdivisions and ensure that charitable and public funds are not unnecessarily diverted from the public good to litigate eligibility for tax-exempt status by providing standards to be applied uniformly in all proceedings throughout this Commonwealth for determining eligibility for exemption from State and local taxation which are consistent with

traditional legislative and judicial applications of the constitutional term "institutions of purely public charity."

10 P.S. § 372 (footnote omitted).

Section 5 of the Act, 10 P.S. § 375, then sets forth "[c]riteria for institutions of public charity." Although the five general criteria in this Section track the five criteria set forth in the *HUP* test, the statute continues further to dictate what is sufficient or insufficient to meet each individual criterion. *Id.* § 375(b)-(f). Section 5 mandates that an institution which meets the five criteria "shall be considered to be founded, endowed and maintained by public or private charity." *Id.* § 375(a). This provision was apparently designed to align the *HUP* test for an institution of purely public charity with the language of the County Assessment Law, which speaks in terms of institutions "founded, endowed and maintained by public or private charity." 72 P.S. § 5020–204(a)(3). Finally, in a provision entitled "parcel review," Section 5 reserves to the political subdivision responsible for real property assessment the "responsibility or prerogative" to "make a determination whether a parcel of property or a portion of a parcel of property is being used to advance the charitable purpose of an institution of purely public charity or to assess the parcel or part of the parcel of property as taxable based on the use of the parcel or part of the parcel for purposes other than the charitable purpose of that institution." 10 P.S. § 375(h)(1). Subsection (h) also reserves to the taxing authority the power to "fil[e] challenges or mak[e] determinations as to whether a particular parcel of property is being used to advance the charitable purpose of an institution of purely public charity." *Id.* Section 6 of the Act, entitled "[p]resumption process," then sets forth the rebuttable presumption available to a qualifying institution of purely public charity, and places the burden on the taxing authority to prove, by a preponderance, "that the institution of purely public charity does not comply with the requirements of section 5 [*i.e.,* the requirements necessary in order to be deemed an institution of purely public charity]." *Id.* § 376(a), (b).

With this background in mind, we turn to the parties' arguments. Appellant contends that the clear language of Article VIII, Section 2(a)(v) requires only that an institution as a whole—and not independent portions of that institution—satisfies the definition of an institution of purely public charity. Thus, the parcel in question need not independently appear to serve, in and of itself, a charitable purpose in order for it to qualify for the tax exemption. Rather, the proper substantive inquiry here is limited to whether appellant's independent living facility is actually and regularly used for the purposes of appellant's institution as a whole, *i.e.*, the purpose for which appellant is organized and operated. Therefore, appellant claims, it had no obligation to demonstrate that the parcel at issue alone qualified as an institution of purely public charity, and the lower courts wrongly assigned it such a burden.

Appellant further argues that the circumstances that led the *HUP* Court to require a preliminary evaluation of whether a taxpayer qualified as an institution of purely public charity are not present where, as here, the question is the real estate tax exemption eligibility for a parcel of land owned by an entity which concededly is an institution of purely public charity. Appellant also emphasizes that, where a purely public charity's property is at issue, the parcel clause of Act 55 expressly requires the taxing authority to determine only whether the particular parcel is "being used to advance the charitable purpose of an institution of purely public charity" or instead is used "for purposes other than the charitable purpose of that institution." 10 P.S. § 375(h)(1). In appellant's view, this test is consistent with the constitutional test for individual parcels, which speaks of "that portion of real property of such institution which is actually and regularly used for purposes of the institution."

Applying Act 55, appellant reiterates that it had already been recognized as an institution of purely public charity for other tax purposes and, in any event, it satisfies the criteria in 10 P.S. § 375(b)-(f). Appellant then contends that the disput-

ed parcel advances its charitable purpose, which is established in its Articles of Incorporation as follows:

> [T]o provide a home and sustenance for aged and infirm members of The Christian and Missionary Alliance, and for such other persons as may be determined by the members of the Board of Directors ... and the transaction of such other business as may be incident to the purpose for which said corporation is to be formed as above set forth so far as the same may not be prohibited to a nonprofit corporation.

Record, tab # 2, p. 1. Appellant notes that the trial court found that its independent living facility helps to fund its skilled nursing and assisted living facilities, charitable facilities which that court agreed qualified for tax exemption. Also, it was undisputed that appellant operated at an overall loss and provided uncompensated goods and services to its residents that totaled 17.94% of its total cost of providing goods and services to all residents, which meets the statutory requirement that, "[t]he institution must donate or render gratuitously a substantial portion of its services." 10 P.S. § 375(d)(1).

Appellant further notes that, as a CCRC, it pursues an integrated mission, and that its independent living facility is completely integrated with, and is not "clearly distinct from," that mission. Appellant maintains that the proceeds from its independent living units and other sources help it to provide for the needs of its elderly residents, without any evidence of an overall profit-making design. Appellant argues that it provides a single, integrated continuum of care for the elderly with an overarching charitable purpose, as defined by its Articles of Incorporation.

Finally, appellant notes that its community is not unique or obscure: there are more than 140 integrated CCRC facilities in Pennsylvania and the need for such facilities likely will increase as the post-World War II "Baby Boom" generation ages into retirement. Were institutions like appellant's not to provide such services, a greater obligation to provide homes, care, and sustenance for Pennsylvania's more aged and infirmed citizens would fall upon the government, and thus, the taxpayers. Appellant concludes that, because there was no

showing below that its independent living facility serves any purpose other than appellant's overall charitable purpose, it was entitled to the charitable exemption.

In response, appellees echo the analysis of the *en banc* majority below. Appellees contend that appellant was required to demonstrate, as a preliminary matter, that the parcel in question, on its own, serves a purely public charitable purpose in order to qualify for exemption. Appellees posit that the restriction on the real property tax exemption represented by the "only that portion" clause of Article VIII, Section 2(a)(v) requires the institution to demonstrate that charitable activity occurs on the specific parcel of land for which the exemption is sought. Appellees construe the constitutional restriction as intended to provide that any property devoted to a charitable use would be exempt, while any parcel not in itself used for charitable purposes would not be, irrespective of how closely the parcel might be connected to, or be deemed in furtherance of, the entity's overall charitable operation. Appellees thus contend that the initial inquiry in this case properly focuses solely on the independent living complex, and whether that facility possesses a wholly eleemosynary characteristic. In appellees' view, the fact that appellant is an institution of purely public charity with respect to other facilities, and the fact that it may appropriately be deemed a single charitable tax entity for purposes of sales and use taxation, does not change the fact that, for purposes of the real estate tax, the inquiry is whether the parcel at issue is devoted to a charitable use. Appellees stress that the "purpose" which triggers the charitable exemption must be to render charity, and not to operate a CCRC which happens to include a charitable component.

Turning to Act 55, appellees argue that the statute does not purport to preempt application of the *HUP* test to determine, as a preliminary matter, whether the claimed exemption falls within Article VIII, Section 2. Appellees further contend that the language of 10 P.S. § 376(a) provides for a "presumption regarding that institution's compliance with the statutory criteria set forth in Section 5 [10 P.S. § 375]"—and not for a

presumption that the institution satisfied the minimum constitutional requirements of Article VIII, Section 2(a)(v). When it comes to the constitutional question, appellees assert, the burden is as before and rests upon the taxpayer. Furthermore, appellees note that the presumption prescribed in Act 55 relates only to the taxpayer's status as an institution of purely public charity, and does not alter the constitutional analysis. Appellees also assert that the Act specifically recognizes the taxing authority's power to deny exemption for that portion of the institution's property not actually used for charitable purposes. *See* 10 P.S. § 375(h)(1).

Finally, appellees maintain that the burden of proof question indeed proves irrelevant in the case *sub judice.* The trial court's finding that appellant does not donate or render gratuitously a substantial portion of its services to the residents of the independent living apartments was sufficient, in appellees' view, to rebut any presumption that the parcel in question was entitled to exemption.

This Court also has the benefit of helpful briefing from amici curiae, on both sides of the dispute. In an amicus brief in support of appellant, the Pennsylvania Association of Nonprofit Homes for the Aging ("PANPHA") argues that the General Assembly has authority to define terms left undefined by the Constitution and that Act 55 exercises that authority, adopting a definition of the term institution of purely public charity. PANPHA notes that the definitions section of Act 55 (Section 3) defines an "institution" as "[a] domestic or foreign nonprofit corporation, association or trust or similar entity," and that the term "institution of purely public charity" is then defined as "[a]n institution which meets the criteria under section 5." 10 P.S. § 373. PANPHA submits that these definitions make clear that the components or divisions of a single, corporate institution are not to be viewed separately for purposes of determining whether the entity as a whole is an institution of purely public charity. PANPHA contends that the exemption inquiry is limited to the question of whether a specific parcel advances the charitable purpose of the qualifying institution. PANPHA maintains that appellant

here supplies a continuum of care throughout the remaining lifetime of its residents in a single, community-like setting, and it therefore should be viewed as a single entity for purposes of determining its eligibility for tax exemption. PANPHA further contends that, because appellant's independent living component is part of a licensed CCRC, by definition it is used in furtherance of the institution's charitable purpose and is therefore entitled to exemption.

PANPHA also cites the CCPRDA, 40 P.S. § 3201 *et seq.*, in support of its single entity argument. PANPHA notes that, among other things, the CCPRDA requires continuing care providers to submit a Disclosure Statement containing the certified financial statements of the provider for the operation of the facility, but does not require a provider to submit financial statements regarding the individual components of the facility. *See id.* § 3207(a)(9)and (10). PANPHA further notes that the CCPRDA regulates the agreements between a provider and its residents and requires the specification of the services to be provided such as food, shelter, nursing care, medications, burial and incidentals. *Id.* § 3214(a)(2). PANPHA stresses that the CCPRDA defines each continuing care provider as a single entity providing a continuum of care to its residents. Moreover, since the definition of the term facility under the CCPRDA includes places (plural) where care is provided, PANPHA contends that the CCPRDA contemplates a campus type of location providing housing and various levels of care services. PANPHA argues that appellant's independent living units are part of a licensed CCRC, and the units therefore are operated in furtherance of appellant's charitable purpose; accordingly, the parcel is tax exempt.

Finally, with respect to the "parcel review" authorized by Section 5(h) of Act 55, PANPHA also notes that the General County Assessment Law exempts institutions of purely public charity as well as "the grounds thereto annexed and necessary for the occupancy and enjoyment" from taxation. 72 P.S. § 5020–204(a)(3). PANPHA then cites case law for the proposition that the exemption is justified if the property contributes in a reasonable manner to the institution's function as a

purely public charity. PANPHA does not dispute that the statute allows the taxing authority to conduct a parcel-by-parcel review of the property of an institution of purely public charity, but it argues that this review is limited to determining whether each parcel is used to advance the charitable purpose of the institution. In this case, PANPHA argues, the parcel does advance that purpose.

■■ The Pennsylvania League of Cities and Municipalities (the "League") has filed an amicus brief in support of appellee Borough of Carlisle. The League argues that the Pennsylvania Constitution requires uniformity in taxation and exemptions do not promote uniformity. The League maintains that the lower courts correctly determined that Article VIII, Section 2(a)(v) requires that the portion of real property for which a taxpayer seeks exemption must meet the threshold constitutional test and the taxpayer's corporate status as an institution of purely public charity is not determinative in deciding whether a particular tract of real estate is exempt. The League asserts that, if the usage of the tract does not possess some eleemosynary characteristic, exemption would violate the Constitution. Because appellant does not donate or render gratuitously a substantial portion of its services relating to the independent living facility, the League contends, the lower courts correctly held that this particular parcel is not entitled to charitable exemption. The League also takes issue with appellant's argument that the continuum of care concept is a proper charitable purpose for real estate tax exemption. The League argues that, in addressing the needs of an aging population, there must be a balance between the long-term care needs of certain individuals and the needs of local government to fund services for a growing, actively participating, and older community of residents.[8]

8. The Pennsylvania School Boards Association ("Association") has also filed an amicus brief in support of appellees. In addition to echoing the arguments of appellees and the League, and providing some discussion of the historical and constitutional background, the Association questions the constitutionality of the Act 55 presumption. The Association submits that the statutory procedure and presumption that Act 55 places upon taxing authorities is "constitutionally infirm," since Article

In a Reply Brief, appellant maintains that it—meaning the institution as a corporate whole—provides continuing care for older citizens at affordable rates that support the costs of providing continuing care for the entire community, and any surplus from any one phase of the continuum of care offsets the expenses of the others. Appellant explains that no part of its continuing care is for commercial purposes or for any purpose other than the charitable purpose for which appellant is organized and recognized as an institution of purely public charity. The fees charged for the assisted living and skilled nursing facilities do not cover the services provided for such continuing care, and surpluses from the independent living apartments help to fund such shortages. Appellant further maintains that the prospect of such continuing and progressive care allows the residents, including those in the independent living units, to live more independently, thereby reducing the need for government service, including government-supported home and community-based programs. Appellant urges that its organizational structure pools the resources of all residents receiving each level of care combined with the charitable resources of appellant in order to assure that all residents have the full continuum of care available as needed, at rates kept reasonable by the combination of charitable giving and resident-provided funds. Appellant reiterates its view that the parcel clause of the Pennsylvania Constitution requires only that the parcel at issue is actually and regularly used by appellant, an admitted institution of purely public charity, for the purposes of the institution, and such is the case here.

VIII, Section 2(a)(v) makes clear that only those portions of the institution's property actually used for charitable purposes are exempt. In its Reply Brief, appellant rebuts the argument. This Court's grant of allocatur did not include a constitutional challenge to the statute, and it is settled that an amicus " 'cannot raise issues that have not been preserved by the parties.' " *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 928 n. 14 (2006) (quoting *Commonwealth v. Cotto*, 562 Pa. 32, 753 A.2d 217, 224 n. 6 (2000)). *See also* Pa.R.A.P. 531(a) (interested party may file amicus curiae brief concerning those questions pending before appellate court); 4 Am Jur. 2d Amicus § 7 (2005) ("[A]n amicus must accept the case before the court with the issues made by the parties. Accordingly, an amicus curiae ordinarily cannot inject new issues into a case which have not been presented by the parties.") (footnotes omitted). Accordingly, we will not address this argument.

Although this Court's grant of review posed the question of the relevance of the statutory rebuttable presumption in Act 55 as subsidiary to the question of parcel review, upon consideration of the points made in briefing, we deem it more appropriate to pass upon the presumption first. In *Community Options v. Board of Property Assessment,* 571 Pa. 672, 813 A.2d 680, 683 (2002), this Court stated that: "An entity seeking a statutory exemption for [sic] taxation must first establish that it is a 'purely public charity' under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached." The constitutional test is the five-part standard set out in *HUP.* In the case *sub judice,* however, it is undisputed that appellant qualifies as an institution of purely public charity under *HUP.* We proceed, then, to the operation of Act 55, including the rebuttable presumption set forth in Section 376.

In theory at least, there may be disputes concerning whether the taxpayer is an institution of purely public charity where the *HUP* test and the standard set forth in the Section 375(b)-(f) criteria would lead to different results. The General Assembly, of course, was not obliged to go as far as the Constitution permitted with respect to tax exemption; thus, not being required to exempt charities at all from any taxes, the legislative body could elect to provide for charitable exemptions on a basis that was more limited than is constitutionally authorized. On the other hand, however, the constitutional command restrains the scope of exemption that may be legislatively authorized. Thus, the General Assembly cannot authorize an exemption that would go beyond what is permitted by the constitutional text and, if an exemption were deemed to exceed what is authorized, the courts would be duty-bound to strike it down.

It is not difficult to imagine why the General Assembly would adopt the presumption in Section 376. The provision ensures than an institution that has been determined to be a purely public charity for certain tax purposes (*e.g.,* sales and use tax) likewise will be presumed to be one for purposes of

real estate taxes. Since a single constitutional term—"institution of purely public charity"—applies with respect to all such exemptions, the presumption promotes uniformity, consistency, and predictability. The declaration and findings of legislative intent attending Act 55, while not binding upon this Court, make clear that the General Assembly was concerned with a perceived inconsistent application of eligibility standards for charitable tax exemptions. Act 55 found that the inconsistencies had led to "confusion and confrontation" among traditionally tax-exempt institutions and political subdivisions to the detriment of the public, a detriment which included the "unnecessar[y] diver[sion]" of "charitable and public funds ... from the public good to litigate eligibility for tax-exempt status." 10 P.S. § 372(b). If the Act 55 presumption and test would lead to a holding that a taxpayer qualified as "an institution of purely public charity," where the *HUP* test would not, fundamental and foundational questions could arise concerning whether: (1) the *HUP* test, which was adopted in the absence of legislation addressing the constitutional term, occupied the constitutional field concerning the exemption, or instead left room for the General Assembly to address the matter; (2) the legislative scheme as adopted comported with the constitutional command and displaced the *HUP* test; and/or (3) if *HUP* were deemed authoritative and comprehensive, whether the legislative findings and scheme set forth in Act 55 gave reason to reconsider the contours of the test thus distilled from judicial experience with individual cases.[9, 10]

9.  Of course, this Court is not obliged to defer to the legislative judgment concerning the proper interpretation of constitutional terms. *See Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 948 (2006) ("the ultimate power and authority to interpret the Pennsylvania Constitution rests with the Judiciary, and in particular with this Court. *See* Pa. Const. art. V, § 2.").

10. It is worth noting that, in *Community Options*, 571 Pa. 672, 813 A.2d 680, the parties agreed that the taxpayer met the qualifications for statutory exemption, but disputed whether the taxpayer qualified as an institution of purely public charity under the *HUP* test. The lower courts divided on the *HUP* question and thus had to confront some of the complexities described in text. This Court's holding on further review—that the taxpayer qualified under *HUP*—avoided the conflict.

The theoretical complexities that might arise where the *HUP* test and the Act 55 test would lead to different conclusions concerning a taxpayer's qualification as an institution of purely public charity are not presented in the case *sub judice*. The parties agree that appellant is as an institution of purely public charity; their substantive dispute involves the proper approach to parcel review. That being said, because there is no constitutional challenge to Act 55 by the parties at hand, appellant certainly was entitled to the statutory presumption that it is an institution of purely public charity and that the burden was upon the taxing authorities to prove otherwise, if those authorities were of a mind to dispute that status. However, there in fact is no dispute over appellant's *institutional status*. Therefore, any error in failing to recognize the import of the statutory presumption is of no moment.

■ We now address the more difficult question of parcel review. Both the trial court and the Commonwealth Court majority determined, in essence, that a parcel of land that is owned by an institution of purely public charity is eligible for exemption only if the parcel, in and of itself, independently satisfies the *HUP* / Act 55 test for determining which entities are purely public charities. This analysis cannot be squared with the constitutional language or the parcel review language in Act 55, which tracks the constitutional standard. Article VIII, Section 2(a)(v) invites and, indeed, requires parcel review. That provision makes clear that the General Assembly may exempt institutions of purely public charity from taxes, but in the case of real property taxes, the institution's exemption only extends to "that portion of real property of such institution which is actually and regularly used for the purposes of the institution." The constitutional test respecting parcel review, then, is not the *HUP* / Act 55 test, which is designed to identify qualifying *institutions*, but a test focusing on the actual and regular *use* that the qualifying institution makes of its property and the relationship of that use to the institution's purposes.

Section 375(h) of Act 55, entitled "parcel review," reads as follows:

(h) Parcel review.—

(1) Nothing in this act shall affect, impair or hinder the responsibilities or prerogatives of the political subdivision responsible for maintaining real property assessment rolls to make a determination whether a parcel of property or a portion of a parcel of property is being used to advance the charitable purpose of an institution of purely public charity or to assess the parcel or part of the parcel of property as taxable based on the use of the parcel or part of the parcel for purposes other than the charitable purpose of that institution.

(2) Nothing in this act shall prohibit a political subdivision from filing challenges or making determinations as to whether a particular parcel of property is being used to advance the charitable purpose of an institution of purely public charity.

10 P.S. § 375. Although the language employed in the statute is not identical to the constitutional text—*i.e.*, where the constitutional text speaks of "used for the purposes of the institution," the statute speaks of "being used to *advance* the *charitable* purpose"—it would appear that any definitional difference is minor and, if anything, would serve to narrow the exemption, which the General Assembly is free to do.

Two other points respecting Act 55 and concomitant parcel review are notable. First, the Act defines, where Article VIII, Section 2(a)(v) does not, the term "institution," as follows: "[a] domestic or foreign nonprofit corporation, association or trust or similar entity." 10 P.S. § 373. The definition is significant, as the dissenting opinions in the Commonwealth Court recognized, because it makes clear that, in conducting statutory parcel review, the individual parcels owned by a single qualifying institution of purely public charity are not to be evaluated as if the parcels represented separate institutions or corporate entities subject to the full-blown *HUP* / Act 55 test. *See Chartiers Valley Sch. Dist.*, 794 A.2d at 984 ("Act 55 defines the basic unit of evaluation as a corporation, association or trust or other similar entity. The basic unit of evaluation may not be aggregated.... Similarly, the basic unit may not be

divided. Our evaluation focuses on a corporation, not on multiple corporations and not on parts of a corporation.") (citation omitted). This "entire institution analysis" (to employ Judge Simpson's apt phrase in dissent below) appears, on its face at least, to comport with the constitutional command, which likewise speaks in terms of a single entity, whose property may be subject to parcel review ("that portion of real property of such institution").[11]

Second, Act 55 does not purport to set forth a presumption or assign a burden of proof with respect to parcel review. Thus, the statute does not suggest that an institution of purely public charity is entitled, by virtue of that status alone, to a presumption that all parcels, or contiguous parcels, of real estate it owns qualify for the charitable exemption.[12] Nor does the statute purport to place the burden on the taxing authority to prove that a parcel is not exempt; to the contrary, the Act reserves to the taxing authority the power of both "filing challenges" and *"making determinations"* concerning parcel review. Accordingly, as with other claims of exemption, the property of the taxpayer in an instance such as this is presumed to be taxable and the affirmative burden, in the first instance, rests upon the taxpayer to prove entitlement to exemption. *Southeastern Pa. Transp. Auth. v. Bd. of Revision of Taxes*, 574 Pa. 707, 833 A.2d 710, 713 (2003); *HUP*, 487 A.2d at 1312 ("Any organization seeking exemption from taxation has the affirmative burden to prove it is entitled to the exemption") (citing, *inter alia*, 72 P.S. § 7236).

11. Of course, if the facts suggested that more than one entity was involved, a separate analysis of each institution would be proper.

12. Appellant argues at multiple points in its brief that the "presumption process" and Section 375(h) operate to "shift the burden" from a qualifying institution of purely public charity to the taxing authority to prove that the disputed parcel does not qualify for exemption. Brief for Appellant, 16, 40, 50. Appellant's amicus goes so far as to suggest that an entity that qualifies as an institution of purely public charity under Act 55 "is entitled to assert a rebuttable presumption of entitlement to tax exemption." Brief for PANPHA, 26. This argument is belied by the plain language of the provision, as discussed above. The statutory presumption and burden shifting in the portions of the Act invoked by appellant are limited to the determination of an institution's status as a purely public charity, and do not encompass parcel review.

The dispositive question then—which the lower tribunals erred in failing to appreciate—is whether the parcel or portion of land comprising appellant's independent living facility "is actually and regularly used for the purposes of the institution" or "to advance the charitable purpose of the institution." The facts respecting the use that is made of the property are not in dispute; thus, the question is resolvable as a matter of law. Considering the unique nature of the institution at issue (*i.e.*, a CCRC operated as a charitable institution), we have no doubt that the independent living facility is indeed actually and regularly used for the purposes of the institution. In considering the question, we note the wisdom in an observation from this Court over a century ago, concerning the distinct question of whether a school qualified as a purely public charity:

[A]n institution that is in its nature and purposes a purely public charity does not lose its character as such under the tax laws, if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. It must not go beyond self-support. When a charity embarks in business for profit, it is liable to taxation like any other business establishment; *but long as the trustees of the school manage it as a charity, giving the benefit of what might otherwise be profit to the reduction of tuition fees, or the increase of the number of free scholars, in furtherance of the "education of youth," the purpose of their trust, their school house is entitled to exemption.* It represents the gift of private persons and of the state.

*Episcopal Academy v. Philadelphia,* 150 Pa. 565, 25 A. 55, 57 (1892) (emphasis supplied).

Appellant's express corporate and charitable purpose is, as appellant notes, to provide a home and care for the aged and infirm. Appellant's status as a CCRC has been recognized and licensed and, as such, it is subject to the restrictions and regulations placed upon such communities by the CCPRDA. Although the independent living facility, if it were viewed in isolation or as a separate institution, might not on its own qualify as a purely public charity, its role in the comprehensive care scheme provided by appellant is consistent with, is

tied to, and advances appellant's charitable purpose. The independent living facility is not a public restaurant, movie theater, golf course or some other unrelated business entity existing solely as a revenue stream to finance a different and charitable endeavor. Instead, as Judge Leavitt emphasized in dissent below, the independent living units offer entry into a community which promises to provide for the future needs of the elderly and infirm, needs that may change over time to include assisted living and skilled nursing care. In the CCPRDA, the General Assembly recognized that such "continuing-care communities have become an important and necessary alternative for the long-term residential, social and health maintenance needs for many of the Commonwealth's elderly citizens." 40 P.S. § 3202.

Appellant's CCRC offers a measure of protection to its residents against the uncertainties and challenges that attend the process of aging. One of the great fears facing citizens as they age is how to care for themselves, if age or circumstance threatens their physical, mental, and financial independence. In return for the capital investment required to enter the facility and the maintenance fees thereafter, residents of the independent living facility receive both a measure of current service and, more importantly, a promise of priority consideration for placement in appellant's assisted living and skilled nursing facilities, if the need should arise. That need for greater and possibly subsidized care could arise in a day, a year, or never. But the promise of such security is significant; it offers, as Judge Leavitt cogently observed, some measure of "lifetime protection."

Although it may not be controlling on its own, the fact that appellant is a charitable institution operating as a CCRC is certainly significant in assessing whether the independent living facility advances the charitable purpose of the institution. CCRCs are licensed and regulated as an integrated whole, in a fashion which ensures both stability and access to varying degrees of care. In appellant's case, whatever surplus one part of its integrated community may generate is used to offset other expenses within the community. Here, as in the *Episcopal Academy* case, it appears that appellant "manage[s]

it[self] as a charity, giving the benefit of what might otherwise be profit to the reduction of [other costs associated with the endeavor] ... in furtherance of [providing a home and sustenance for the aged and infirm], the purpose of their trust." Because it is apparent that the assisted living facility is used for the charitable purpose of appellant's institution, it qualifies for real estate tax exemption.[13, 14]

This Court is well aware of the burdens placed on local government to support services and functions that benefit all

13. We reiterate that our holding is commanded by the unique nature of this particular type of charitable institution. We do not suggest that a purely public charity could successfully claim exemption for any separate money-generating facility and property, so long as it proved that the proceeds were diverted to its charitable facilities. We recognize the force in the observation of the *en banc* majority below that such an approach could encompass almost "any use" of the property.

14. We recognize that the decision below was consistent with prior decisions from the Commonwealth Court such as *Appeal of Lutheran Social Services* and *Appeal of Bethlen Home*. However, Judge Leavitt's points in distinction are well taken, including that those cases do not appear to have involved an argument by the taxpayer institutions that they were required to be evaluated as a single entity, for purposes of parcel review, nor does it appear that the courts in those cases were presented with an argument stressing the nature of charities operating as CCRCs. In any event, decisions of the Commonwealth Court, of course, do not bind this Court, and to the extent those decisions are inconsistent with our analysis and holding today, they are disapproved.

We are aware of the Commonwealth Court's recent decision in *Lock Haven University Foundation v. Clinton County Bd. of Assessment Appeals*, 920 A.2d 207, 2007 WL 685463 (Pa.Cmwlth.2007). The *Lock Haven* panel examined whether certain real property of the Lock Haven University Foundation ("Foundation"), an institution of purely public charity organized essentially to approve and coordinate all fundraising activities carried out on behalf of the University, was entitled to the real estate tax exemption for a student housing complex located adjacent to the University. In holding that the Foundation was entitled to the exemption, the panel found that the lower tribunals erred in examining the student housing complex in isolation from the Foundation as a whole. The panel explained that the proper legal analysis requires a determination of whether the Foundation as a whole meets the constitutional criteria for an institution of purely public charity, and second, a determination of whether the whole institution satisfies the criteria in Section 375(b)-(f) of Act 55. The panel also sought to distinguish the Commonwealth Court decision in *Alliance Home*, while recognizing that the further appeal in that case was pending here. We offer no view on the ultimate propriety of the *Lock Haven* decision noting only that, of course, the decision in this case controls to the extent that the *Lock Haven* decision could be said to be inconsistent with it.

residents and taxpayers, including charitable organizations. We also recognize, as we did seventy years ago, that "[w]hen any inhabitant fails to contribute his share of the costs of this protection, some other inhabitant must contribute more than his fair share of that cost." *Young Men's Christian Ass'n*, 187 A. at 210. On the other hand, however, we recognize the important public role served by institutions of purely public charity, that their very mission serves to relieve government of some of its burden, and that the type of institution at issue here certainly performs that laudable goal. The Constitution authorizes exemption of such institutions from taxation, and the General Assembly has long elected to provide for exemption, thus determining as a matter of policy to provide a subsidy to those charitable organizations who themselves assume some of the burden of government. The question of when and where best to draw that line is one that reasonable people might debate. Much of the argument in the briefs of the taxing authority's amici is devoted to such questions of policy. However, that argument is better made to the General Assembly.

For the foregoing reasons, we reverse.

Former Justices NIGRO and NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY and Justice SAYLOR, EAKIN and BAER join the opinion.