**READING HOUSING AUTHORITY**

v.

**BOARD OF ASSESSMENT APPEALS OF BERKS COUNTY, Pennsylvania, and Our City–Reading, Inc., Goggle Works Apartments, LLC and Reading School District.**

**Goggle Works Apartments, LLC**

v.

**Board of Assessment Appeals of Berks County, Pennsylvania, and Our City–Reading, Inc., and Goggle Works Apartments, LLC.**

**Our City–Reading, Inc.**

v.

**Board of Assessment Appeals of Berks County, Pennsylvania, and Reading School District.**

**Appeal of: Board of Assessment Appeals of Berks County, Pennsylvania.**

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2014.

Decided Nov. 12, 2014.

John B. Nevius, Exton, for appellant.

James H. Thomas, Lancaster, for amicus curiae, National Association of Housing.

Michael C. Kochkodin and David M. Kozloff, Wyomissing, for appellees.

BEFORE: DAN PELLEGRINI, President Judge, BERNARD L. McGINLEY, Judge, BONNIE BRIGANCE LEADBETTER, Judge, ROBERT SIMPSON, Judge, P. KEVIN BROBSON, Judge, PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge LEADBETTER.

The Board of Assessment Appeals of Berks County appeals from an order of the Court of Common Pleas of Berks County that sustained the tax assessment appeals of the Reading Housing Authority (RHA), Goggle Works Apartments, LLC, and Our City–Reading, Inc., collectively "Appellees," concluding that the subject property, an apartment building owned by the RHA, which houses a mix of 20% low-income and 80% market-rate tenants, was immune from real estate tax.[1] In 2006, the General

---

1. The RHA is a municipal housing authority. Goggle Works is a Pennsylvania limited liability company (LLC) with a leasehold interest in the building. Our City–Reading, Inc., is a Pennsylvania corporation, organized pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), and "established to restore or build new homes or apartments in the City of Reading, redevelop industrial sites, clean brownfield sites, redevelop business districts, all within the City of Reading." Stipulated Finding of Fact (F.F.) No. 3. Our City–Reading, Inc., "is the 0.01% Managing Member of Goggle Works and Lancaster Arts Hotel Investment Fund, LLC ... and is the

Assembly amended the Housing Authorities Law to provide for mixed-use projects.[2] We consider here whether the RHA, which undertook the mixed-use project at issue pursuant to Section 10.1 of the Housing Authorities Law,[3] is using the property for an essential public and governmental purpose such that it is not taxable. For the reasons that follow and based, in large part, on the well-reasoned decision of the Honorable Scott E. Lash, we affirm.

In considering Appellees' tax assessment appeals, Common Pleas conducted a trial and the parties submitted a stipulation of facts in lieu of providing evidence. In relevant part, the facts are as follows. The RHA owns the 59–unit residential apartment building at issue, located at 135 Washington Street, Reading, Pennsylvania, and known as the Goggle Works Apartments. Stipulated Finding of Fact (F.F.) No. 7. The building has 59 individual apartment units, with 44 two-bedroom

units and 15 one-bedroom units. F.F. Nos. 52–54. It is commonly referred to as an "80/20 project," where at least 20% of the units are set aside for low-income residents. F.F. No. 56. In this case, 12 of the units are reserved for low-income housing and the rental rate for these "public units," all one-bedroom apartments, is established according to the United States Department of Housing and Urban Development (HUD) guidelines and subsidized by HUD. F.F. No. 55. The remaining 47 "market-rate units" are rented at market rates.[4] F.F. No. 60. Construction of the apartment building was completed in the fall of 2012 and the first tenants moved there in October 2012. Approximately 80% of the building is occupied, including all 12 public units and 35 of the market-rate units. F.F. Nos. 70 and 71.

■ After construction was completed, the Board issued an October 2012 interim, new construction assessment notice to Appellees indicating an ·assessed value. of

99.99% member of Goggle Works." F.F. No. 5.

2. Section 3(l.1) of the Housing Authorities Law defines "Mixed-use Projects" as follows:
   *Any project that includes a* commercial, industrial, *market-rate residential* or retail component, *and* either—(1) *a low-income housing component;* or (2) is within a two-mile radius of a low-income housing project owned, leased, either in the capacity of lessor or lessee, held or financed by an Authority.
   Act of May 28, 1937, P.L. 955, *as amended,* added by Section 1 of the Act of November 9, 2006, P.L. 1355, 35 P.S. § 1543(l.1) (emphasis added).

3. In pertinent part, Section 10.1 provides as follows:
   Without limiting the powers set forth in [Section 10 of the Housing Authorities Law, 35 P.S. § 1550], an Authority shall have the power to do all acts that are necessary, convenient or useful to the development or operation of one or more mixed-use projects, including, with the approval of the

municipality in which the Authority lies, the power to plan, design, locate, acquire through purchase, the exercise of powers under 26 Pa.C.S. (relating to eminent domain) or otherwise, hold, construct, finance, improve, maintain, operate, own or lease, either in the capacity of lessor or lessee, land, buildings, other structures and personal property necessary, convenient or useful to the development or operation of a mixed-use project.
Added by Section 3 of the Act of November 9, 2006, P.L. 1335, 35 P.S. § 1550.1.

4. Specifically, "[r]ental rates for Market Rate Units vary and are currently priced at [$950] per month for a one-bedroom unit, and $1050 (floors 2–4) or [$1200] per month for a two-bedroom unit. (floor 5)." F.F. No. 64. Prospective market-rate tenants must provide, *inter alia,* evidence of six months of continuous and permanent employment, authorization for criminal background and credit history checks and pay stubs indicating that their monthly gross income is three times the monthly rent. F.F. No. 66.

$5,098,400.00. F.F. No. 86. According to the common-level ratio then in effect, 73.2%, the corresponding fair market value of the building in 2012 was $6,965,027.32. F.F. No. 87. In November 2012, Appellees each filed assessment appeals with the Board, requesting a finding of tax exemption or, in the alternative, a reduction in the assessed value. In December 2012, the Board issued a decision denying immunity and exemption status for the property, concluding that taxes should be assessed on the property because approximately 80% of the building was utilized for residential rentals at market value, which it determined was outside the scope of the public purpose for which the RHA was incorporated to operate. On appeal to Common Pleas, Appellees claimed that the RHA, as a governmental agency of the Commonwealth and acting within the scope of its authority in all matters pertaining to the property, was entitled to immunity from real estate tax. After trial, Common Pleas declared that the RHA's real estate was immune from real estate taxation and sustained Appellees' appeals. The Board's appeal to this Court followed.[5]

■ A property owned by a municipal authority, which is primarily and principally used for a public purpose, is not taxable. *Norwegian Twp. v. Schuylkill County Bd. of Assessment Appeals*, 74 A.3d 1124, 1130–31 (Pa.Cmwlth.2013), *appeal denied*, —— Pa. ——, 84 A.3d 1066 (2014). The origin for this tax exemption is Article 8, Section 2(a)(iii) of the Pennsylvania Constitution, which provides that, "[t]he General Assembly may by law exempt from taxation ... [t]hat portion of public prop-

erty which is actually and regularly used for public purposes[.]" After enumerating specific examples of property exempt from all county, city, borough, town, township, road, poor and school taxes, *e.g.,* schoolhouses and burial grounds, the General Assembly also included the following: "[a]ll other public property used for public purposes, with the ground thereto annexed and necessary for the occupancy and enjoyment of the same...." Section 204(a)(7) of the General County Assessment Law.[6] In addition, Section 23 of the Housing Authorities Law,[7] in relevant part, provides as follows: "The property of an Authority is declared to be public property used for essential public and governmental purposes and such property and an Authority shall be exempt from all taxes and special assessments, except school taxes, of the city, the county, the Commonwealth, or any political subdivision thereof...."

■ Where, as here, a municipal authority owns the real estate, the taxing authority bears the burden of proving that the property is not being used for a public purpose in order for the property to be taxable. *Norwegian Twp.,* 74 A.3d at 1131. In determining whether a municipal authority has forfeited its tax immunity status, a court must employ what has become known as the "public-use" test. It provides that, "a court must first look at the broader question of whether the agency's action is within its 'authorized purposes and powers.'" *Southeastern Pa. Transp. Auth. v. Bd. of Revision of Taxes,* 574 Pa. 707, 833 A.2d 710, 716 (2003) (*SEPTA*). In addition,

---

5. The issue of whether a property is tax exempt or immune from taxation is a question of law. Accordingly, our review is plenary. *Granville Twp. v. Bd. of Assessment Appeals of Mifflin County,* 900 A.2d 1012 (Pa.Cmwlth. 2006).

6. Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(a)(7).

7. 35 P.S. § 1563.

the court must also consider the scope of the immunity, *i.e.*, whether the property was acquired or used for a purpose that is within the operation of the agency. In making this determination, the court must keep in mind that immunity is not limited to the absolute minimum of property necessary for operations.

*Id.* at 716. We agree with Common Pleas that the first prong of the public-use test was satisfied.

Sections 10 and 10.1 of the Housing Authorities Law, 35 P.S. §§ 1550 and 1550.1, respectively, detail authorities' powers and their additional powers with regard to mixed-use projects. Even the Board does not dispute that the RHA had the power to undertake the mixed-use project at issue.[8] Instead, the Board argues that, just because the RHA had the power to develop the apartment building does not mean that development of that mixed-use project advanced its purposes under the Housing Authorities Law. To address that argument, we turn next to the disputed issue of whether the second prong of the public-use test was met: "whether the property was acquired or used for a purpose that is within the operation of the agency." *SEPTA*, 833 A.2d at 716.

The parties stipulated that the RHA is a municipal housing authority, created pursuant to the Housing Authorities Law, with the stated purpose of advancing the Commonwealth's mission of providing subsidized housing to individuals of modest or low income. F.F. No. 2. More specifically, the General Assembly in Section 2 of the

Housing Authorities Law set forth the following purposes for housing authorities:

> The public purposes for which [housing] authorities shall operate shall be—(1) the clearance, replanning and reconstruction of the areas in which slums exist; (2) *the providing of safe and sanitary dwelling accommodations for persons of low income through new construction* or the reconstruction, restoration, reconditioning, remodeling or repair of existing structures, so as to prevent recurrence of the economically and socially disastrous conditions hereinbefore described;[9] and (3) the accomplishment of a combination of the foregoing. Such purposes are hereby declared to be public uses for which public money may be spent, and private property acquired by the exercise of the power of eminent domain.

35 P.S. § 1542 (emphasis added) (footnote added).

In considering the tax appeals at issue, Common Pleas concluded that the entire property was being used for essential public and governmental purposes such that none of it was taxable. Specifically, Common Pleas rejected the Board's argument that the present case was controlled by *SEPTA*, in which our Supreme Court concluded that the metropolitan transportation authority had forfeited its tax immunity status, in part, when it leased part of its headquarters to commercial entities thereby acting as a commercial landlord. There was no dispute that the portion of the building that SEPTA used for its head-

---

8. Board's Brief at 17–18.

9. In that regard, Section 2(a) of the Housing Authorities Law provides as follows:

    (a) There exist in urban and rural communities, within the various counties of this Commonwealth, numerous slums and unsafe, unsanitary, inadequate or overcrowded dwellings, which conditions are accompanied and aggravated by an acute shortage of decent, safe and sanitary dwellings within the financial reach of persons of low income, such conditions arising from overcrowding, dilapidation, faulty construction, obsolete buildings, lack of proper light, air, and sanitary facilities.

quarters was immune from taxation. With regard to the portion that it rented to commercial entities, however, our Supreme Court concluded that it was not immune from taxation, adopting the Commonwealth Court's reasoning:

[T]he purpose of SEPTA is to operate a transportation system in Southeastern Pennsylvania. While SEPTA is free to lease its real estate to tenants and is under the direction to raise revenue, clearly the leasing of real estate, solely to raise revenue, is not an activity connected to SEPTA's purpose. Therefore, SEPTA property leased to commercial tenants is not immune from taxation.

833 A.2d at 717 [quoting *Southeastern Pa. Transp. Auth. v. Bd. of Revision of Taxes,* 777 A.2d 1234, 1238 (Pa.Cmwlth.2001)].

In distinguishing *SEPTA* from the present case, Common Pleas noted that SEPTA's "rental units bore no relationship to the core purposes for which SEPTA was created, being utilized merely to raise revenue." Common Pleas' Opinion at 24. In contrast, Common Pleas determined that the 80% market-rate units in the mixed-use project at issue constituted an essential part of the RHA's purpose such that the property was not rendered taxable merely because all of the units were not allocated to low-income residents. The *SEPTA* test requires an expansive vantage point and, "[t]o consider the 'scope' of the operations is to consider the operations as a whole." *Id.* at 22. This is consistent with our Supreme Court's observation in *SEPTA* regarding the scope of immunity for a government entity: "[T]he court must keep in mind that immunity is not limited to the absolute minimum of property necessary for operations." 833 A.2d at 716. As Common Pleas reasoned in the present case, "[t]he concept of 'scope' also incorporates consideration of the goals to

be achieved by RHA in taking its actions." Common Pleas' Opinion at 22.

■ In that regard, Common Pleas first noted that the General Assembly amended the Housing Authorities Law in 2006 to include provisions permitting housing authorities to develop and operate mixed-use projects. Thus, the mixed use project was well within its authorized powers. Next, in determining that the RHA's inclusion of the market-rate units was consistent with its purpose, Common Pleas noted, as pointed out in Appellees' supplemental [trial court] brief that:

Most housing professionals agree that concentrating assisted-housing for low- and very low-income Americans in dense, urban areas is not an effective use of scarce affordable housing resources. Over the past decade, professionals in the affordable housing industry have turned increasingly to mixed-income housing as an attractive option because, in addition to creating housing units for occupancy by low-income households, it also contributes to the diversity and stability of American communities. *HUD–2003–15CPD.*

Common Pleas' Opinion at 23 (footnote omitted).

Thus, the trial court concluded that the subject property

provides substantial support for a positive change in the character of the community which, in conjunction with the low income housing, aids in the prevention of any reoccurrence of the economic and socially disastrous conditions associated with slums, such as overcrowding, dilapidation of buildings and other concerns listed in [Section 2 of the Housing Authorities Law's] Declarations of Policy.

*Id.* at 24 (footnote omitted).

Finally, our determination is consistent with our Supreme Court's reasoning in

*Alliance Home of Carlisle v. Board of Assessment Appeals,* 591 Pa. 436, 919 A.2d 206 (2007), which involved the purely public charity provision found in Article 8, Section 2(a)(v) of the Pennsylvania Constitution. In that case, the Court considered whether the independent living facility of a continuing care community owned by a non-profit corporation qualified as an institution of purely public charity such that it was tax exempt. (It had previously been determined that both the skilled nursing and assisted living facilities were exempt from real estate taxation.) Ultimately, the Court concluded that, "[c]onsidering the unique nature of the institution at issue . . . we have no doubt that the independent living facility is indeed actually and regularly used for the purposes of the institution." *Id.* at 225. In so determining, the Court reasoned as follows:

> Although the independent living facility, if it were viewed in isolation or as a separate institution, might not on its own qualify as a purely public charity, its role in the comprehensive care scheme provided by appellant is consistent with, is tied to, and advances appellant's charitable purpose. The independent living facility is not a public restaurant, movie theater, golf course or some other unrelated business entity existing solely as a revenue stream to finance a different and charitable endeavor. Instead, the independent living units offer entry into a community which promises to provide for the future needs of the elderly and infirm, needs that may change over time to

include assisted living and skilled nursing care.

*Id.* at 226.

Similarly, in the present case, the market-rate units cannot be viewed in isolation. Both the market-rate and public units form an integrated whole and, pursuant to the findings of fact, the former are critical to the success of the latter. Specifically, the fact-findings indicate that the market-rate units were essential to obtaining the financing needed for the property to be constructed, including the public units, and the RHA issued bonds guaranteed by HUD. In addition, the role of the market-rate units in the comprehensive housing scheme is consistent with and tied to the purposes of the RHA. As we noted above, one of the RHA's authorized purposes under Section 2 of the Housing Authorities Law is "the providing of safe and sanitary dwelling accommodations for persons of low income through new construction . . . so as to prevent recurrence of the economically and socially disastrous conditions hereinbefore described. . . ."[10] Here, the commingling of tenants of varying incomes, made possible by the inclusion of market-rate units, is an essential component of the permissible mixed-use project.

Accordingly, we affirm.

President Judge DAN PELLEGRINI concurs in the result only.

### ORDER

AND NOW, this 12th day of November, 2014, the order of the Court of Common

---

10. We reject the Board's suggestion that Common Pleas' use of the word "revitalization" is indicative that it confused the powers and purposes of a housing authority with those of an urban redevelopment authority. While it is true that a housing authority endeavors to provide affordable housing to the low-income community and an urban redevel-

opment authority attempts to eliminate blighted areas through economically and socially sound development, those goals necessarily intersect to the extent that eliminating and preventing recurrence of slum type environments is also a statutory goal of housing authorities.

Pleas of Berks County is hereby AF-FIRMED.